425 So.2d 521 (1982)
James Franklin ROSE, Appellant,
v.
STATE of Florida, Appellee.
No. 51724.
Supreme Court of Florida.
December 9, 1982.
Rehearing Denied February 8, 1983.
Richard L. Jorandby, Public Defender, and Louis G. Carres, Asst. Public Defender, West Palm Beach, for appellant.
*522 Jim Smith, Atty. Gen., and Charles Corces, Jr., Asst. Atty. Gen., Tampa, for appellee.
ALDERMAN, Chief Justice.
The defendant, James Franklin Rose, appeals his conviction for murder in the first degree and his sentence of death. He also appeals his conviction and life sentence for kidnapping. We affirm the convictions and the life sentence, but finding reversible error in the penalty phase of the trial, we vacate the sentence of death and remand for a new sentencing proceeding before a jury.
Although circumstantial in nature, the evidence was sufficient for the jury to have found beyond a reasonable doubt that defendant, and no other person, kidnapped and murdered eight-year-old Lisa Berry. The evidence reveals that defendant was the last person to be seen with Lisa at the bowling alley on the night she disappeared. Barbara Berry, Lisa's mother, was at the bowling alley with family and friends when defendant arrived shortly after 9 p.m. on October 22, 1976. According to Barbara, defendant joined her and other team members at the bowling circle where they talked for several minutes. Shortly after 9:30 p.m., defendant said that he was going to the poolroom area of the bowling alley. Lisa told her mother that she was going with him. Defendant and Lisa were last seen by Lisa's sister Tracy, who testified that Lisa was outside the front door of the bowling alley and defendant was standing just inside the front door. Defendant gave Tracy money for cokes, but when she returned from the snack bar with the cokes, both defendant and Lisa were gone. Upon being informed by Tracy that she could not find defendant and Lisa, Barbara attempted to find them. While looking for them, she was paged for a telephone call which turned out to be from defendant. He asked Barbara the time; she said 10:30. He responded that it was 10:23. He asked what time she would be finished bowling; she said 11:30. Defendant was next seen entering the bowling alley at approximately 11:30 p.m. The medical examiner's testimony established the time of Lisa's death to be within twenty-four hours either side of 1 a.m., October 23, 1976.
The evidence reveals that defendant had a motive for killing Lisa. Although he and Lisa's mother had dated for about nine months, they were no longer dating regularly because he was extremely jealous about her working in the bowling alley bar and being around other men. Lisa's mother testified that defendant told her that he could hurt her and that she did not know what he was capable of doing. A male friend of Barbara's who was at the bowling circle when defendant was there was asked by Lisa if he was going to have breakfast with her and her mother. According to testimony at trial, defendant, after having overheard this conversation had a look on his face as if to say, "What is going on?"
Several people present at the bowling alley testified that when defendant returned at approximately 11:30, he had a large red spot on his lower right trousers leg. Expert testimony revealed the spot to be type B blood. Type B bloodstains also were found on the outside of the passenger's door of defendant's white van, on the passenger's seat, and on the engine cover. Fingernail scrapings taken from defendant revealed blood. It was stipulated in the record that Lisa had type B blood and that defendant had type A blood.
At about 11:45 p.m. on the night Lisa disappeared, a white van was seen behind a Pantry Pride store located about a quarter of a mile from the bowling alley. Defendant was seen driving his white van that same night. According to testimony at trial, when the search for Lisa began shortly after defendant's return to the bowling alley at 11:30, he drove away and returned at least three times. Lisa's green sweater and pink pants were found the next afternoon behind the Pantry Pride. Her pink blouse was later found in defendant's van. Lisa's nude body was found four days after her disappearance in a canal approximately ten miles from the bowling alley. Her shoes were found about a mile apart alongside a *523 road between the canal and the bowling alley.
A paint-stained hammer was found in the canal about six feet from Lisa's body. Defendant was a painter, and expert testimony revealed that paint samples from the hammer were similar to paint samples taken from paint cans in his van. The medical examiner testified that Lisa's death resulted from severe head injuries caused by blunt force.
Expert witnesses also testified that a green fiber taken from defendant's clothing after his arrest was consistent with fibers from Lisa's green sweater found behind the Pantry Pride and that a crushed hair taken from defendant's sock was consistent with hair from Lisa's hairbrush.
Defendant made numerous inconsistent attempts to account for his whereabouts on the evening Lisa disappeared and to explain away certain evidence. Defendant told Lisa's mother that he was at the Highway Bar when he telephoned her regarding the time and stated to her that it was 10:23. He was uncharacteristically exact about the time, and he could be clearly heard without background noise which, according to testimony, would not have been possible had he been at the bar when he telephoned since the band at the bar would have been playing loudly at that particular time.
When defendant returned to the bowling alley at 11:30, he pretended that Lisa was still alive. Acting as though Lisa was present at the bowling alley in his visible sight, he commented to Lisa's mother that Lisa was getting chubby and asked who was the person with the goatee to whom Lisa was talking. When she turned around to see who defendant was referring to, she saw neither Lisa nor a person with a goatee.
After initially denying that the spot on his trousers leg was blood, defendant later explained that he had cut himself changing a tire. Testimony indicated the spare tire was fully inflated. He told a police officer that he had cut his leg while crawling underneath the van to check out a noise he had heard. When the officer took defendant to the area where he claimed to have crawled under the van, the officer could not find any impressions in the sand that could have been made by a human body.
In an attempt to cover the blood spot on his trousers which was first noticed and called to his attention upon his return to the bowling alley at 11:30, defendant first covered it with a whitewash or paint. Later, after he went into a restroom, the spot was covered with grease or some black substance. Defendant explained to a police detective that the blood on the seat of his van was from an injured friend whom he had taken home about two months earlier. The friend had type A blood. The blood on the seat was type B, the same as Lisa's.
Defendant, at one point, told police detectives that Lisa had last been near the van about two weeks prior to the night of her disappearance. He later stated that Lisa had attempted to get into the van earlier that evening and he told her to get out. Lisa's mother testified that Lisa had not been in defendant's van for about a year.
Defendant was convicted for the kidnapping and first-degree murder of Lisa Berry. The jury recommended death, and the trial court sentenced him to death for the murder and to life imprisonment for the kidnapping.
Defendant challenges his convictions on several grounds. He initially contends that the evidence was insufficient to support his convictions for first-degree murder and kidnapping. We find, however, that the record contains a chain of substantial, credible evidence to support the jury's finding that defendant was guilty of kidnapping and first-degree murder. Whether, as defendant asserts, the evidence failed to exclude all reasonable hypotheses of innocence is for the jury to determine, and we will not reverse a judgment based upon a verdict returned by a jury where there is substantial, competent evidence to support the jury verdict. Welty v. State, 402 So.2d 1159 (Fla. 1981); Clark v. State, 379 So.2d 97 (Fla. 1979), cert. denied, 450 U.S. 936, 101 S.Ct. 1402, 67 L.Ed.2d 371 (1981).
*524 Defendant also challenges the trial court's giving of an "Allen charge"[1] during the guilt phase of the trial. After seven hours of deliberation, the court instructed the jury:
Ladies and gentlemen, it is your duty to agree on a verdict, if you can do so without violating conscientiously held convictions that are based on the evidence, or the lack of evidence.
No juror, from mere pride of opinion, hastily formed or expressed, should refuse to agree; yet, no juror, simply for the purpose of terminating the case, should acquiesce in a conclusion that is contrary to his own conscientiously held view of the evidence.
You all should listen to each other's views, talk over your differences of opinion in the spirit of fairness and candor; and, if possible, resolve your differences and come to a conclusion, so a verdict may be reached and this case may be disposed of.
Defense counsel, without stating any grounds, objected to this instruction after it was given.[2] Defendant contends that it was error to give this instruction without first notifying counsel and without giving counsel an opportunity for discussion. He relies upon Florida Rule of Criminal Procedure 3.390(d) which provides that "[o]pportunity shall be given to make the objection out of the presence of the jury," and Florida Rule of Criminal Procedure 3.410 which provides that if after the jury retires to consider their verdict, they request additional instructions, such instructions shall be given only after notice to the prosecuting attorney and to counsel for defendant. Defendant also emphasizes that the jury had deliberated only seven hours before the "Allen charge" was given.
Although we agree with defendant that his counsel should have been notified prior to the giving of this instruction, we find such error to be harmless in the present case. Aside from this harmless procedural error, however, the giving of the "Allen charge" by the trial court was not error. The jury had already deliberated seven hours at the time they were given this charge. We note further that the jury deliberated over an hour longer before reaching their verdicts of guilty of the kidnapping and first-degree murder of Lisa Berry. In State v. Bryan, 290 So.2d 482 (Fla. 1974), we found no error in the trial court's delivering an "Allen charge" to the jury after five and one-half hours of deliberations.
Although he did not object at the time, defendant now argues that three prospective jurors who expressed concern about the death penalty were improperly excused by the trial court in contravention of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We expressly stated in Maggard v. State, 399 So.2d 973 (Fla.), cert. denied, 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 598 (1981), that an objection to excusing a juror on the basis of Witherspoon must be made to the trial court before the juror is excused. We hold that defendant is in no position to raise this point on appeal. Brown v. State, 381 So.2d 690 (Fla. 1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981).
We have considered the remaining issues raised by defendant directed to his conviction and find them to be without merit. In addition to reviewing the record in light of the errors alleged by defendant, we have reviewed the evidence pursuant to Florida Rule of Appellate Procedure 9.140(f) to determine whether the interests of justice require a new trial and conclude that no new trial is required on the convictions.
Defendant also challenges his death sentence. He contends that the trial court reversibly erred in giving the "Allen charge" during the penalty phase of the *525 trial. We agree. The record indicates that the charge was given after the jury advised the court by a note which read, "We are tied six to six, and no one will change their mind at the moment. Please instruct us." At that point, the trial judge should have advised the jury that it was not necessary to have a majority reach a sentencing recommendation because, if seven jurors do not vote to recommend death, then the recommendation is life imprisonment. There was no reason to give the "Allen charge" during the penalty phase of the trial. We therefore vacate the death sentence and hold that defendant is entitled to a new sentencing proceeding before a jury. In light of this disposition, we find it unnecessary to resolve the remaining challenges to the death sentence raised by defendant.
Accordingly, we affirm the convictions for first-degree murder and kidnapping, but we vacate the death sentence and remand to the trial court for further proceedings consistent with this opinion.
It is so ordered.
ADKINS, BOYD, McDONALD and EHRLICH, JJ., concur.
OVERTON, J., concurs in part and dissents in part with an opinion.
OVERTON, Justice, concurring in part, dissenting in part.
I concur with that portion of the opinion which holds that it was improper to give the Allen charge during the penalty phase of the trial.
I dissent, however, from that portion of the majority opinion which holds that giving the Allen charge during the trial phase was harmless error. During jury deliberations, the trial judge, on his own motion, gave the Allen charge without any advice from the jurors that they were deadlocked, without previously announcing his intention to do so, and without affording counsel an opportunity to argue the need for the charge. Although I support the use of the Allen charge, determining when it is to be used is a sensitive issue and depends on the circumstances of each case. Here, the evidence of guilt was circumstantial. Before this Court appellant contended that this circumstantial evidence was a tenuous basis for finding guilt. The sufficiency of this evidence is apparently an arguable issue since the appellant's first trial ended in a mistrial because of the jury's inability to reach a verdict.
Some jurisdictions have rejected the use of the Allen charge as improperly influencing jurors.[*] In my view, the Allen charge is a fair and proper instruction which should be available to trial judges. It should only be used, however, where (1) the jury advises the judge that it is deadlocked, (2) counsel is provided notice of the trial judge's intention to give the instruction, and (3) counsel has an opportunity to be heard concerning the need for and the contents of the instruction. Only when these factors are present can the need for the Allen charge be established and basic due process be provided. Because none of these factors have been established in this case, I must conclude that giving the Allen charge during the trial phase was prejudicial error, not harmless error, and, therefore, I would grant a new trial.
NOTES
[1] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); Fla.Std. Jury Instr. (Crim.) 2.21.
[2] "So that the record is clear, Judge, I would like the record to reflect the defense objects to the Charge that the Court just gave to the jury, known among the lawyers as the Allen Charge."
[*] The courts in the following cases rejected the use of the Allen charge: State v. Thomas, 86 Ariz. 161, 342 P.2d 197 (1959); Taylor v. People, 176 Colo. 316, 490 P.2d 292 (1971); State v. Randall, 137 Mont. 534, 353 P.2d 1054 (1960); State v. Maupin, 42 Ohio St.2d 473, 330 N.E.2d 708 (1975); State v. Ferguson, 84 S.D. 605, 175 N.W.2d 57 (1970). The Allen charge was rejected in favor of the standard instruction recommended by the American Bar Association in the following cases: People v. Gainer, 19 Cal.3d 835, 139 Cal. Rptr. 861, 566 P.2d 997 (1977); People v. Prim, 53 Ill.2d 62, 289 N.E.2d 601 (1972), cert. denied, 412 U.S. 918, 93 S.Ct. 2731, 37 L.Ed.2d 144 (1973); Burnette v. State, 280 Md. 88, 371 A.2d 663 (1977); People v. Sullivan, 392 Mich. 324, 220 N.W.2d 441 (1974); State v. Martin, 297 Minn. 359, 211 N.W.2d 765 (1973); Commonwealth v. Gartner, 475 Pa. 512, 381 A.2d 114 (1977). See Annot., 97 A.L.R.3d 96 (1980) for a complete discussion of modern cases dealing with the Allen charge.