496 So.2d 903 (1986)
Charles FRATELLO, Appellant,
v.
STATE of Florida, Appellee.
No. 85-2082.
District Court of Appeal of Florida, Fourth District.
October 22, 1986.
Rehearing Denied November 26, 1986.
*904 Edward M. Kay of Kay and Bogenschutz, P.A., Fort Lauderdale, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Robert S. Jaegers, Asst. Atty. Gen., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
This is an appeal, following a verdict of murder in the first degree and a sentence to life imprisonment with a minimum mandatory term of twenty-five years after the prosecutor told the court that he was not seeking the death penalty. We affirm.
On December 20, 1984, Michael Johnson, the victim, went to the Seminar Lounge in Broward County, Florida, with his boss, Art Schaefer. Schaefer ran an auto body repair shop which was repairing a station wagon for appellant Charles Fratello. Fratello had purchased the used station wagon for his wife as a Christmas present and had expressed to Schaefer his concern that the repairs were taking longer than expected. Schaefer had taken appellant to his shop and returned appellant to the Seminar Lounge. Fratello, an auto wholesaler working for his brother in New Mexico, had flown in on December 19 and had hoped to start back for New Mexico on December 20.
That evening, the night of December 20 to December 21, 1984, Lori Ann Melton was employed at the Seminar Lounge as a nude dancer. She was introduced to appellant by Toni Miller, another nude dancer. Toni told Lori that appellant was named Charlie, and that he was the owner of the bar. Lori had never seen appellant before.
Ten or fifteen minutes before 2:00 a.m. on December 21, 1984, Lori Melton, seated at a table with her husband, Toni Miller and Toni's husband and two other dancers, saw appellant, Charles Fratello, engaged in a scuffle near the disc jockey booth with a man she identified as the victim, Michael Johnson. She testified that appellant grabbed the victim by the throat and dragged him into the Lounge's kitchen. She testified that a number of other people went into the kitchen for a short time but everyone came out except appellant and the victim. Appellant states Lori admitted she really did not have a clear view of this activity, but actually all she admitted to was that she had to move a small distance in order to see everything she described. Sergeant Michael Blair, who sat at the same table, with Lori, during the investigation that took place after the call to the police, testified that a wall prevented seeing into the kitchen from that table. Detective Kerry Coltau testified that a straight line could be drawn from the Meltons' table to the back wall of the *905 lounge  a distance of sixty-nine feet  without touching any obstruction. Lori showed some confusion over whether Chris Ross was one of the men involved in the altercation.
William Murray, a large man employed as a bouncer, testified that a "disturbance" between the appellant and Michael Johnson, the victim, took place in the early morning hours of December 21, 1984. He testified the disturbance took place near the disc jockey booth and the short hall on the north of the lounge. When he asked appellant what was going on, appellant said it was being taken care of. Chris Ross, a manager, and Mark, a night manager, came up to the scene of the disturbance. Murray testified the disc jockey may also have come along. Appellant and the victim then went on into the kitchen. Murray had stopped one of Michael Johnson's punches by grabbing him with his hand and then let go when Johnson relaxed and put his arms down. According to Murray, only the victim and appellant went into the kitchen. Between two and five minutes later, Murray heard what he described as a crashing noise. Murray testified that from the time appellant and the victim went into the kitchen, until the time he heard the crashing noise, he did not see appellant come out of the kitchen. He did not see anyone else go into the kitchen other than appellant and the victim. Murray provided no testimony that would indicate the Meltons could not have seen the "disturbance." Later, Murray saw the lower portion of a person slumped over in the corner of the kitchen, but he continued to close the bar and did not tell anybody about seeing the person lying there.
Lori Melton's husband, Michael Melton, testified that he saw a fight begin about 2:00 a.m. on December 21, 1984. He testified that he saw a number of people, including appellant, "whopping" on the victim. He testified that the victim, Michael Johnson, was held around the neck by appellant, Charles Fratello, and was dragged by him around the corner into the "back," and Melton saw nothing more. Melton testified that although there were other individuals with appellant and the victim, these individuals, the disc jockey, the bouncer, the new night manager, and the other manager, named Chris, came running out from the back less than a minute after they rounded the corner. As to appellant and the victim, Michael Melton testified: "they were the only two that didn't come out at the time I saw the rest of them come out." Melton testified that he sat at the southwest corner of a table with his wife who was seated at the southeast corner of the table. Melton testified it wasn't much of a fight with one against four. They punched and kicked the victim. Melton testified he saw appellant being hit in the head, punched and knocked backwards. When appellant rejoined the fray, everyone grabbed the victim. However, Melton did see the victim being held around the neck by appellant and saw appellant drag the victim around the corner.
Immediately after the others returned from the back, they announced the bar was closed. During the five minutes or so Melton was waiting for his wife, the first girl out of the dressing room said: "They shot him." Melton testified he called the police because he thought it was bad enough the man was stomped on, and it wasn't necessary to shoot him. A tape of the telephone call, at 0207.03 hours on 21 December 1984, was introduced into evidence and played. At the time Melton was on the telephone, his wife testified that a little short drunk guy (Hernandez) acted like he wanted to talk, so her husband gave Hernandez the phone because the police kept switching him from operator to operator. Then appellant came walking around from behind the back of the lounge building. She testified that appellant asked what they were doing and she told him they were calling the police because there had been a shooting. Appellant said, "No, there hasn't." "Go on home, everything is fine." She testified that appellant then took the telephone away from Hernandez and hung it up. The emergency 911 recording contains appellant's voice saying, "Nothing is going on inside. No trouble in the bar." Michael *906 Melton testified he had a "buzz" on, but he denied being drunk. Detective Kerry Coltau testified Mike Melton was not drunk. However, Melton was agitated.
When patrolman John Hawkins arrived at the Seminar Lounge, about four minutes after the telephone call, appellant, Charles Fratello, was sitting with Hernandez by a planter box in front of the Seminar Lounge. The officer testified that appellant "said that nothing was wrong and everything was o.k. and we can go ahead and go."
Disregarding appellant's statement the officer checked the bar together with another officer. When they reached the kitchen area they heard a "snorting noise," and when they looked they saw the victim lying face down in a pool of blood.
The medical examiner testified the victim died on December 22, 1984. The cause of death was a contact gunshot wound on the left side of the head with the bullet traveling from about one inch behind the victim's left ear, through his head, into the frontal lobe of his brain on the right side whence it was recovered. One stain of human blood was found on appellant's trousers.
Detective Kerry Coltau testified that appellant telephoned his brother and said, "It's bad, there's been a shooting in the club." The appellant then asked the detective to "[p]ray for me that the guy doesn't die". Appellant then told the detective that he couldn't remember anything that happened. Detective Kerry Coltau testified that he did not see anything that would indicate either Lori Ann Melton or Michael Melton was intoxicated.
The outside security door to the kitchen was locked by a dead bolt from the inside. A security gate outside of the outside security door was open a few inches.
The medical examiner testified that the victim was bruised over his right eye, and there was a contact gunshot wound on the left side of the head and a small abrasion on the left cheek.
Blood spatters were found on the floor where the victim was found and also on two of three telephone booths located outside of the Lounge. No gun was ever found. Blood samples were taken from appellant's clothing but were unusable. A .32 calibre shell casing was recovered from the floor of the kitchen, three feet from the victim. Swabs were rubbed over appellant's hands to check for gunpowder residue; however, this was done too late to result in a conclusive test.
William Murray testified that he saw appellant in the Lounge maybe a dozen times between March of 1984 and December 21, 1984.
Appellant presented testimony that the Broward Sheriff's Office was requested to send a helicopter to search a field behind the Lounge for a suspect. The helicopter pilot searched for about an hour and found no one. He was assisted by canine officers on the ground.
Appellant presented testimony of Floyd Matlick that Matlick was the owner of record of 100% of the stock of the corporation that owned the Seminar Lounge. He had known appellant for a couple of years, and testified that appellant was a good customer.
Todd Miller, Toni Miller's husband, testified that he was unemployed and receiving worker's compensation. He said Lori Melton was quite intoxicated. He testified that you could see from the table all the way to the back of the bar. Todd Miller testified he does not condone cooperating with the police at all in "personal things." He also testified that he had not known Michael Melton long enough to be a character witness concerning him.
Mary Collins, a cocktail waitress at the Seminar Lounge, testified that appellant was known as a good friend of the people that own the bar. He had been in the bar approximately ten times that Collins saw him. Collins testified that a person ran and jumped on appellant's back yelling and screaming. Appellant was the only person seated at the bar on that side. Collins saw the bouncer, the disc jockey, the night manager, and the manager together with someone *907 else dragging the troublemaker out, but because of the other patrons, he was not dragged out the front door but instead "they went into this room." Collins saw appellant, Charles Fratello come out of the kitchen, but could not specify when he came out. She said he then returned to his seat, sat down and continued drinking. Appellant then said, "Let's clean up and go."
Appellant testified that someone grabbed him, others got involved and he was released and went back to his seat at the bar. He testified that he only went as far as the middle of the bar and that Billy Murray is a liar. Appellant admitted saying words to the effect of "Let's get going." Appellant had told the police a couple of weeks before that he was the manager of the Lounge. Appellant testified he never shot anybody, he was jumped from behind, he was never in the bar's kitchen nor was he anywhere near the alcove to the kitchen. On cross-examination appellant testified to giving a wrong middle name to police and a wrong birth date. Appellant stated he "don't remember" about falsely swearing an oath to obtain a Florida driver's license with a false address and false name on it. Appellant admitted to giving a false Florida address to police. Appellant admitted using his cousin's identification to obtain a Florida driver's license. Appellant admitted using another alias, Charles Bellow, and admitted he lied when he used this name in court. Appellant admitted he told Officer Rosindy that he was the manager of the Seminar Lounge, and he also admitted he must have told a New Jersey state trooper he was employed by the Seminar Lounge. Appellant admitted to possessing a Florida insurance card with the name of the insured being 1401 Powerline Road, Inc., d/b/a The Seminar. Appellant then denied any connection with the Seminar Lounge. Appellant testified he didn't remember anything happening at the bar after he was released from the grasp of the victim. He did not inquire why the victim had grabbed him.
Detective Kerry Coltau testified that appellant told him he was too drunk and couldn't remember anything at all about what happened inside the Seminar Lounge on December 21st. Coltau admitted he had not put this statement into any report. Appellant was arrested by Officer Joseph Fitzpatrick.
There are three issues, which we restate as follows:
I. Whether the circumstantial evidence against appellant was sufficient as a matter of law to support denial of appellant's motion for judgment of acquittal and his conviction of murder in the first degree, when appellant was not seen with a gun, and was merely in the vicinity of where the victim was found; and when the evidence was consistent with a reasonable hypothesis of appellant's innocence. We conclude that the trial court properly denied appellant's motion for judgment of acquittal, and sustain his conviction.
II. Whether the trial court erred in instructing the jury that they could find appellant guilty as aider and abettor if they did not believe appellant shot the victim, because the evidence failed to support that theory. We conclude that the court did not err.
III. Whether the trial court erred in denying appellant's motion to inspect the grand jury minutes and dismiss the indictment as based on irrelevant, illegal and prejudicial evidence. We conclude that it did not.

I
Appellant contends there are several hypotheses of his innocence that are as likely as his guilt of the killing of Johnson, and of premeditation. These hypotheses are that (1) one of the other persons, seen to participate in the scuffle with Johnson, and members of the procession into the alcove near the kitchen, shot him; (2) a white male seen by the police at the telephones where blood was found, who fled the scene when the police arrived, killed Johnson; (3) someone already in the kitchen before Johnson arrived there, or someone who entered the kitchen thereafter through the unlocked *908 outside door, killed Johnson; (4) the death was accidental and not premeditated, based on the medical examiner's testimony that the bruise on Johnson's cheek could have been from a gun butt, and the gun could have accidentally gone off as a result of the blow.
Our supreme court wrote in Rose v. State, 425 So.2d 521, 523 (Fla. 1982), as follows:
Defendant challenges his conviction on several grounds. He initially contends that the evidence was insufficient to support his convictions for first-degree murder and kidnapping. We find, however, that the record contains a chain of substantial, credible evidence to support the jury's finding that defendant was guilty of kidnapping and first-degree murder. Whether, as defendant asserts, the evidence failed to exclude all reasonable hypotheses of innocence is for the jury to determine, and we will not reverse a judgment based upon a verdict returned by a jury where there is substantial, competent evidence to support the jury verdict. Welty v. State, 402 So.2d 1159 (Fla. 1981); Clark v. State, 379 So.2d 97 (Fla. 1979), cert. denied, 450 U.S. 936, 101 S.Ct. 1402, 67 L.Ed.2d 371 (1981).
Here, too, there is a chain of substantial, credible evidence to support appellant's conviction of first degree murder. Several witnesses saw an altercation between appellant and the victim. Several witnesses saw appellant and others take the victim back towards the kitchen. There was testimony that all but appellant and the victim returned to the barroom, and that appellant returned after the "crash" was heard from the kitchen. Not long afterwards a witness saw the victim lying in the kitchen. Finally, there was evidence appellant tried to head off the police both on the telephone and after they arrived at the scene, and his telephone conversation with his brother could be interpreted as admitting a role, at least, in the shooting.
At the time the trial judge had to decide whether to grant or deny Fratello's motion for judgment of acquittal, it was up to the trial judge to determine whether a jury could reasonably conclude that the evidence excludes every reasonable hypothesis but that of guilt. E.g., Green v. State, 408 So.2d 1086 (Fla. 4th DCA 1982). (The cases say "whether the jury might reasonably conclude that the evidence fails to exclude every reasonable hypothesis but that of guilt," but we don't think that is what is intended.) Here the court concluded that the jury could reasonably rule out hypotheses other than that of appellant's guilt. This court's task is merely to determine whether, "after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment." Tibbs v. State, 397 So.2d 1120 (Fla. 1981), affirmed, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); Rose, 425 So.2d at 523. There was sufficient, competent, albeit circumstantial, evidence to support the verdict in this case.
According to Bradford v. State, 460 So.2d 926 (Fla. 2d DCA 1984), petition for review denied, 467 So.2d 999 (Fla. 1985), a jury need not believe the defendant's version of the events in a circumstantial evidence case when there is legally sufficient evidence in contradiction to the defendant's explanation. Fratello's denial that he ever went to the kitchen was contradicted by testimony of other witnesses, and could be ignored. The jury here could properly conclude that Fratello killed Johnson, and that other hypotheses were not reasonable. Specifically as to the outside intruder hypothesis, there was testimony that while the outer gate was open, the security door itself, leading to the kitchen, was locked.
As to premeditation, it is the law that it may be inferred from the method of the killing, the nature and manner of the wounds inflicted, and the accused's actions before and after the homicide. Hall v. Wainwright, 565 F. Supp. 1222 (M.D.Fla. 1983). Here the fact of the altercation near the bar, and the testimony that Fratello forcibly took the victim  holding him by the neck or the throat  to the kitchen; that *909 he told the bouncer the problem was being taken care of, that Johnson was shot behind the ear at contact; and that Fratello tried to get the place closed promptly after the shooting, point toward premeditation.

II
On his closing argument, the prosecutor argued:
PROSECUTOR: The instruction I think the court will give will be this: If two or more persons help each other commit a crime and the Defendant is one of them, the Defendant must be treated as if he had done all of the things the other person or persons did. If the Defendant knew it was going to happen, intended to participate actively or by sharing an expected benefit, actually did something by which he intended to help commit the crime.
She is going to tell you, if you put this in nuts and bolts, what does it mean to you. What she is going to say is that if you find that the Defendant took the gun himself and shot the victim, he's guilty of murder in the first degree.
If you find he helped anybody else out, if he did anything to help anybody else out, if he grabbed the victim around the neck and dragged him into the back room, knowing that the victim was going to be killed, he's guilty of murder in the first degree.
It makes no difference whether he pulled the trigger himself. It makes no difference whether he had the gun himself. If he aided or assisted or abetted, did anything to help out, he's guilty of murder in the first degree. That's the law in the State of Florida. In fact, it's the law in every other jurisdiction in the United States. Well, that's the law. That's what has to be established.
In State v. Roby, 246 So.2d 566, 570-571 (Fla. 1971), the Florida Supreme Court reviewed the case law history, beginning in 1893, of the principle that a person charged by indictment or information with committing a crime may, upon proof, be convicted of aiding and abetting the commission of that crime. The Roby opinion also cites Jacobs v. State, 184 So.2d 711 (Fla. 1st DCA 1966), for the holding that one charged with aiding and abetting may upon proof be found guilty of actual commission of the crime, and vice versa. In the latter event, because an aider and abettor is, under section 777.011, Florida Statutes (1985) (formerly section 776.011), a principal, said the Jacobs court, the accused may be found guilty as charged. The Roby court cited this holding with approval.
On the defendant's motion for directed verdict, defense counsel was unable to provide the trial court with any satisfactory theory, principle or authority to eliminate consideration of the defendant in this case as an aider and abettor. So, too, at the time of the charge conference.
Appellant's brief, moreover, plows considerable fresh territory that does not appear in the record of the trial on this point.
We disagree with appellant's contention, now made in his briefs, that the aider and abettor theory is unavailable to the state because it cannot name, with certainty, the individual who pulled the trigger, by producing an eyewitness or confession.
Further, again referring to the briefs rather than what occurred at trial, we fail to find that the state has built an inference upon an inference.
The prosecutor's closing argument, in describing the witnesses' testimony, was as follows:
All of them said the Defendant was involved in the altercation. All of them said that two of them were trading punches.
And all of them said that Charles Edward Fratello or Charles Daniel Fratello or Frank J. D'Amato or Charles Bellow, whatever his name is, grabbed the victim by the neck and dragged him back into the kitchen.
Not Chris Ross, not Bill Murray, not Mark Lombardi or Rick Cluft, it was the Defendant who grabbed him by the neck and it was the Defendant who dragged *910 him back into the kitchen and it was the Defendant who lied to you yesterday on the stand.
And who doesn't come out. It's not Mark Lombardi, Chris Ross or Rick Cluft or Bill Murray, it's the Defendant. Who is the one who stays back in the kitchen. Who is the one back there when Murray hears the sound, the crashing sound. It's the Defendant that's got the blood stain on the back of his pants. Not his blood, we know that. If it was, you'd have heard that trumpeted across the courtroom. Well, it doesn't take a big jump in imagination to where that blood came from someone who had their brains blown out in the back.
We know that the Defendant came out to the telephones when Louis Hernandez was on the telephone and hung it up. Why would he do that. Why would he block a telephone call to the police, because he's a great guy and wants to give Louis Hernandez a ride home, when he doesn't have a car and he don't know when his ride is going to get there. Or does he not want the police there so he can get rid of the body. And when the police officers arrive in the front, what does he tell the police, "Go ahead and take off, it's okay, everything is all right, nothing's happened."
Defendant/appellant argued at trial there could have been some other person in the kitchen who entered from the outside and who shot the victim; and that blood found at the phone booths could tie in with this theory, as could the futile police search of the area with the aid of a helicopter, and the fact the weapon was never found. We think the instruction on aiding and abetting was appropriate in light of defendant's theory of defense.

III
Appellant's third issue is that the trial court erred in denying appellant's motion to dismiss the indictment, for he contends the indictment was obtained by introduction before the grand jury of irrelevant information about appellant's alleged Cosa Nostra associations. Confounded with that issue is the thesis that appellant should have been granted his writ of habeas corpus, or an order for in camera inspection of the grand jury minutes so as to determine whether the prejudicial matter had been put before the grand jury. Appellant's conjecture that it happened derives from the fact that such information was brought to the judge's attention when it was being considered whether bond should be granted. That it was appropriate for the state to bring the information up at that proceeding, appellant has not denied.
Appellant claims it is no fishing expedition, because he is able to pinpoint the information allegedly presented to the grand jury. The defect in this argument is that he is able to do this pinpointing only because the state attorney spoke of Fratello's reputation according to organized crime investigations, at the bond hearings; he presents not a scintilla of evidence that any of this information was put before the grand jury. To this he responds that he is in a Catch-22 situation, for he can't know what is in the minutes if they remain secret.
Appellant argues that the secrecy of grand jury proceedings is not absolute; there is Florida case law on the subject, and the governing statute, section 905.27, Florida Statutes (1985), permits disclosure of grand jury evidence for determining consistency of a witness' testimony, determining whether a witness has perjured himself, or in the furtherance of justice.
Most of the Florida case law relating to inquiry into grand jury proceedings concerns impeachment or perjury of a witness, and is therefore not strictly pertinent to the present case. Our supreme court said in State v. Schroeder, 112 So.2d 257, 259-260 (Fla. 1959), that "a court for the purpose of quashing an indictment will never inquire into the character of the evidence that influenced a grand jury in finding such indictment" (quoting Richardson v. State, 100 Fla. 835, 130 So. 718, 720 (1930)) (emphasis added by Schroeder court) (citations omitted). The Schroeder court also quoted *911 the supreme court's opinion in Johnson v. State, 157 Fla. 685, 695, 27 So.2d 276, 281 (Fla. 1946), for the rationale that it would be absurd for a criminal defendant first to have a trial on the sufficiency and legality of the evidence produced in support of the charge, and then a second trial on the legality and sufficiency of the charge itself.
In the instant case, the above reasoning makes perfect sense. The indictment is, after all, no more than an accusation. The grand jury says, in effect, not that the defendant has committed an offense, but that there seem to be sufficient grounds to try him in order to determine whether he committed the offense. The defendant gets his day in court at his trial; it is not necessary that he also have a chance to attack the indictment itself. The unusual secrecy of the grand jury proceedings is the result of centuries of experience; it helps protect the indictment process from interference by thugs. It apparently continues to be the law of this state that "a court will not, for the purpose of determining a motion to quash, consider the legality, character, or sufficiency of the evidence upon which an indictment or information is based." Schroeder, 112 So.2d at 261. Cf. United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).
We point out that the contention of the defendant in Schroeder implicated her right against self-incrimination. She claimed the grand jury had obtained from her lawyer incriminating information she had shared with him that should have been protected by the attorney-client privilege. If the Florida Supreme Court held as it did in that case, it is certain the minutes of the grand jury proceedings in this case were properly kept inviolate.
Appellee, the state, argues also that this issue was laid to rest when the petition for writ of habeas corpus was heard here and denied, and so when it was raised before Federal District Judge Gonzalez. Neither the federal court's order nor this court's order of April 24, 1985 directly addresses this issue. Under Florida law, appeal of an issue is not barred by the doctrine of res judicata if it was raised in a prior habeas corpus petition but was not decided on the merits. See Bashlor v. Wainwright, 369 So.2d 695 (Fla. 1st DCA 1978). Cf. Autry v. Estelle, 464 U.S. 1301, 104 S.Ct. 24, 78 L.Ed.2d 7 (1983) (res judicata historically inapplicable to habeas corpus proceedings). However, according to Florida case law res judicata does apply if the issue was clearly considered and disposed of in the prior habeas proceedings. See Antone v. Wainwright, 444 So.2d 959 (Fla. 1984).
The trial court in the case at bar correctly denied the motion for in camera inspection of the grand jury proceedings.
ANSTEAD, J., and WARNER, MARTHA C., Associate Judge, concur.