ON MOTION FOR REHEARING
 

 NORTHCUTT, Judge.
 

 Upon consideration of Respondent’s motion for clarification and/or rehearing, rehearing is granted and this court’s opinion dated April 13, 2011, is withdrawn. The attached opinion is substituted therefor.
 

 No further motions for rehearing or clarification will be entertained.
 

 In this unusual case, Anthony D’Arcan-gelo seeks certiorari review of the circuit court’s order denying his motion to determine his competency and to stay proceedings on his motion for postconviction relief. We previously granted D’Arcangelo’s petition, but the State filed a timely motion for rehearing in which it made a concession that renders D’Arcangelo’s petition moot. For that reason, we withdraw our previous opinion and we now deny D’Arcangelo’s petition.
 

 A. Facts Underlying D’Arcangelo’s Motion for Postconviction Relief.
 

 In 1982, a jury in Tampa convicted D’Arcangelo of two counts of first-degree murder. The State endeavored to have him sentenced to death, but the penalty-phase jurors split evenly on the question. The trial court concluded that the appropriate punishment was life imprisonment, and it imposed that sentence.
 

 At D’Arcangelo’s guilt-phase trial, the State had presented testimony from an FBI agent that he performed a comparative bullet lead analysis (CBLA), comparing bullets recovered from the crime scene with unspent bullets discovered at D’Ar-cangelo’s residence. The agent found an association between the bullets from the two locations. He testified that “the bullets came from the same box of ammunition or another box of ammunition having the same composition.”
 

 Many years later, in August 2008, an FBI laboratory director sent a letter to the Thirteenth Circuit State Attorney advising that the agent’s expert trial testimony overstated the significance of his conclusions. Based on this newly discovered information, D’Arcangelo filed a pro se motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. Some months later, he obtained legal counsel, who filed an amended motion.
 

 D’Arcangelo claimed that the CBLA testimony was the only evidence that physically linked him to the crime and that, at the time of trial, neither he nor his attorney could have discovered that this evidence was unreliable. He asserted that if
 
 *1176
 
 the discredited evidence had not been admitted, he likely would have been acquitted. D’Arcangelo asked the postconviction court to vacate his conviction and sentence and to grant him a new trial.
 
 Cf. Murphy v. State,
 
 24 So.3d 1220 (Fla. 2d DCA 2009) (holding allegations in the prisoner’s rule 3.850 motion — that he recently discovered the CBLA evidence presented at his 1995 trial had been discredited and that he would probably have been acquitted if the evidence had not been introduced — could support relief under rule 3.850(b)(1));
 
 Smith v. State,
 
 23 So.3d 1277 (Fla. 2d DCA 2010) (same).
 

 B. D’Arcangelo’s Competency and its Effect on the Postconviction Proceeding.
 

 In late 2009, D’Arcangelo’s attorney began to suspect that her client was incompetent, and she hired an expert to examine him. The expert confirmed counsel’s suspicions. Counsel then filed a simple motion seeking a stay of the rule 3.850 proceedings until resolution of D’Arcangelo’s mental status. The motion asserted that there was a substantial issue regarding D’Arcangelo’s competence and that due process required that he be competent during the postconviction process. The court denied the motion, relying on
 
 Carter v. State,
 
 706 So.2d 873 (Fla.1997), for the proposition that in postconviction proceedings a defendant’s competence is necessary only when a factual matter is at issue or when the development of such an issue would require the defendant’s input. In its ruling, the court limited its focus to the question raised by D’Arcangelo’s rule 3.850 motion, i.e., whether the newly discovered evidence discrediting the CBLA analysis would have resulted in a different outcome at trial, and it determined that the motion presented a legal issue, not a factual one.
 

 Counsel thereafter filed another motion again seeking a stay and also requesting a competency hearing. But this time the motion described the quandary that D’Ar-cangelo could face. The motion asserted that case law bearing on whether D’Arcan-gelo could be exposed to the death penalty after a retrial was not consistent.
 
 Compare Bullington v. Missouri,
 
 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) (holding that a jury’s verdict of life imprisonment barred the possibility of the death penalty at a retrial);
 
 and Arizona v. Rumsey,
 
 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984) (barring death penalty on retrial when the trial judge in first trial sentenced defendant to life),
 
 with Sattazahn v. Pennsylvania,
 
 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003) (holding that a trial court’s discharge of the jury after it failed to reach a unanimous verdict and its entry of a life sentence did not bar the death penalty on retrial). Thus, the motion argued, D’Arcangelo had a factual decision to make: Should he proceed with his rule 3.850 motion and potentially expose himself to the death penalty? Or should he play it safe, withdraw his challenge concerning the CBLA testing, and spend the rest of his life in prison? The court again denied the motion.
 

 D’Arcangelo filed a timely petition for a writ of certiorari seeking to quash the postconviction court’s order.
 
 See State v. Ayala,
 
 604 So.2d 1275 (Fla. 4th DCA 1992). We stayed the proceedings on his motion for postconviction relief pending the disposition of the certiorari petition.
 

 C. The Circuit Court’s Order.
 

 We disagree with the circuit court’s reasoning behind its decision to deny D’Arcangelo’s motion. The circuit court relied on
 
 Carter,
 
 in which the supreme court established procedures addressing the incompetence of death-sentenced defendants in postconviction cases.
 
 See Carter,
 
 706 So.2d at 876. Those procedures are now incorporated in Florida Rule of
 
 *1177
 
 Criminal Procedure 3.851(g). It provides that a “death-sentenced prisoner pursuing collateral relief under this rule who is found by the court to be mentally incompetent shall not be proceeded against if there are factual matters at issue, the development or resolution of which require the prisoner’s input.” Fla. R.Crim. P. 3.851(g)(1). A competency hearing is required if “there are reasonable grounds to believe that a death-sentenced prisoner is incompetent to proceed and that factual matters are at issue.” Fla. R.Crim. P. 3.851(g)(3).
 

 Carter
 
 is, indeed, instructive, but it does not directly control this case.
 
 Carter
 
 applies to incompetent death-sentenced prisoners only, as does rule 3.851. And as the
 
 Carter
 
 court noted, its purpose was to further society’s interest in the proper imposition of the death penalty while insuring a proper and timely resolution of post-conviction proceedings. 706 So.2d at 877. Rule 3.850, applicable in postconviction proceedings by prisoners who, like D’Ar-cangelo, are not sentenced to death, contains no incompetency procedures comparable to those set forth in rule 3.851.
 

 Even so, we note that Florida jurisprudence has long held that every individual has a natural right to due process, which embodies a fundamental conception of fairness.
 
 See Jones v. State,
 
 740 So.2d 520, 523 (Fla.1999). In
 
 Luckey v. State,
 
 979 So.2d 353 (Fla. 5th DCA 2008), a case involving a prisoner not sentenced to death, the postconviction court denied a rule 3.850 claim even though the prisoner exhibited signs of incompetence at the evi-dentiary hearing on his claim. The Fifth District reversed the denial of the claim, noting that although
 
 Carter
 
 was limited to death-sentenced defendants, basic due process considerations such as notice and an opportunity to be heard required a post-conviction court to address a prisoner’s mental competence before proceeding with an evidentiary hearing.
 
 Id.
 
 at 356.
 

 Luckey
 
 was consistent with
 
 Carter
 
 in one respect that is not as apparent in D’Arcangelo’s case:
 
 Luckey
 
 involved an evidentiary hearing on the factual issue of whether Luckey’s trial counsel had been ineffective by allegedly failing to warn him that he faced a term of life imprisonment as a prison releasee reoffender if he rejected the State’s fifteen-year plea offer. In other words,
 
 Luckey
 
 fell neatly on the “factual issue” side of the factual-legal dichotomy drawn by the
 
 Carter
 
 court when it extended to death-sentenced postconviction petitioners the right to be competent only in proceedings involving factual issues.
 

 In D’Arcangelo’s petition for writ of cer-tiorari, his counsel maintained that the decision whether to further pursue his rule 3.850 petition and possibly expose himself to the death penalty was a factual issue for purposes of
 
 Carter.
 
 We are tempted to agree — such a question certainly would not present a legal issue to be decided by the postconviction court. But it is apparent that when outlining the right to be competent in capital postconviction proceedings, the
 
 Carter
 
 court had in mind factual matters “at issue,” i.e., fact issues to be determined by the postconviction court based on evidentiary presentations.
 
 [1]
 

 But even if D’Arcangelo’s dilemma does not fit squarely within the fact-at-issue limitation, there is reason to believe that the limitation would not, or should not, apply to his case. As mentioned,
 
 Carter
 
 was premised in part on the court’s goal of
 
 *1178
 
 “furthering society’s interest in the proper imposition of the death sentence while at the same time promoting the timely commencement and resolution of postconviction proceedings.”
 
 Carter,
 
 706 So.2d at 877. Here, society’s interest in carrying out the prisoner’s sentence is not a factor; D’Arcangelo was sentenced to life imprisonment, he has already begun serving that sentence, and he would continue serving that sentence during any delay in his post-conviction proceeding occasioned by a determination that he is incompetent.
 

 For that reason, among others, it is unclear whether the
 
 Carter
 
 court would find that a prisoner in D’Arcangelo’s position has the right to be competent at this postconviction stage. The court did not directly address this issue in the context of a noncapital case, but we note that the
 
 Carter
 
 opinion cited favorably to
 
 State v. Debra A.E.,
 
 188 Wis.2d 111, 523 N.W.2d 727 (1994), a case that was similar to D’Ar-cangelo’s in that significant respect.
 
 Carter,
 
 706 So.2d at 876. In
 
 Debra A.E.,
 
 counsel for a noncapital postconviction relief petitioner requested a competency determination because he feared that his client was not competent to decide whether to proceed with her petition and possibly subject herself to a harsher, albeit noncapital, penalty. The Supreme Court of Wisconsin held that the petitioner was entitled to be competent in order to make that decision.
 

 Competency is a contextualized concept; the meaning of competency in the context of legal proceedings changes according to the purpose for which the competency determination is made. Whether a person is competent depends on the mental capacity that the task at issue requires. One task required of defendants during postconviction relief is to make the decision to proceed with or forego relief.
 

 523 N.W.2d at 732 (footnotes omitted). The court concluded that a defendant is incompetent to pursue postconviction relief “when he or she is unable to assist counsel or to make decisions committed by law to the defendant with a reasonable degree of rational understanding.”
 
 Id.
 

 We acknowledge that the
 
 Carter
 
 court might not necessarily recognize a right of competency for any postconviction petitioner who might face a harsher penalty after a retrial. But the very existence of the
 
 Carter
 
 decision is testament to the court’s recognition that “death is different.”
 
 Crump v. State,
 
 654 So.2d 545, 547 (Fla.1995) (citing
 
 State v. Dixon,
 
 283 So.2d 1, 17 (Fla.1973)). Unlike the case of a capital defendant, who has nothing to lose by pursuing postconviction relief, a life-imprisoned defendant who might face the death penalty after a retrial would risk his life by going forward. This would not be merely a harsher punishment; it would be the harshest, irremediable penalty that our society can exact. We conclude that notions of due process and basic fairness— essential requirements of law — would require that a prisoner be competent when deciding whether to proceed on a course that might eventually cause him to be put to death.
 

 D. This Court’s Decision to Exercise its Certiorari Jurisdiction.
 

 Early in this proceeding, to assist us in determining whether to exercise our cer-tiorari jurisdiction, we directed the State to file an “unequivocal response” to the question of whether it would be barred from seeking the death penalty if D’Arcan-gelo were to be granted a new trial. The State advised that “[bjased upon the record, or lack, thereof, in this case, it is submitted that the State can go forward and seek the penalty on a retrial of this case.'
 

 
 *1179
 
 This response weighed heavily in our consideration of D’Arcangelo’s petition. Whatever might have been this court’s view of the law on that underlying issue, the State’s assertion that on retrial it would have the legal ability to seek D’Ar-cangelo’s death posed a risk to him, however slight, that had to be weighed when electing whether to proceed with his quest for postconviction relief. That calculation could not be made by the lower court or this one, or by D’Arcangelo’s attorney. Faced with the possibility that the State would attempt to put him to death, the decision whether to go forward had to be his alone.
 

 In light of the State’s assertion that there was indeed such a possibility, we determined to exercise our jurisdiction. Based on the analysis set forth above, we concluded that D’Arcangelo had to be competent in order to decide whether to further pursue postconviction relief. We granted the petition and quashed the order denying D’Arcangelo’s motion for a competency determination.
 

 E. The State’s Motion for Rehearing.
 

 In its rehearing motion, the State changed its position. It now maintains that if D’Arcangelo is granted a new trial and is again convicted for the charged crimes, “death is no longer a permissible penalty in this case.” We agree.
 

 Our conclusion in this regard follows a line of United States Supreme Court decisions beginning with
 
 Bullington,
 
 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270, decided the year before D’Arcangelo was convicted. In that case, the Court concluded that a capital sentencing scheme requiring the finder of fact to make specific findings in' support of a death sentence implicates the Double Jeopardy Clause of the Fifth Amendment.
 

 At the time of Bullington’s offense, Missouri law provided that upon a defendant’s conviction of capital murder, the trial court was to conduct a “presentence hearing” before the jury. The jury was to consider evidence and argument regarding the existence of statutorily defined aggravating and mitigating factors and make a sentencing determination. A death sentence was required to be unanimous and to be supported by a . written designation of the aggravating circumstances the jury found to exist beyond a reasonable doubt. The jury’s determination was binding on the judge, except that if the jury could not within a reasonable time unanimously agree to a death sentence, the judge was required to impose a life sentence.
 
 Bullington,
 
 451 U.S. at 434-35 n. 4, 101 S.Ct. 1852. Bullington’s first trial culminated in a jury verdict sentencing him to imprisonment for life without parole for fifty years.
 

 The Supreme Court held that Bullington could not be subjected to the death penalty on retrial after his conviction was reversed due to errors in the composition of the jury. Although it was recognized in decisions such as
 
 North Carolina v. Pearce,
 
 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), that generally there is no bar to imposing a harsher sentence at retrial after a defendant has successfully challenged his conviction, the
 
 Bullington
 
 Court held that the “clean slate” rationale is “inapplicable whenever a jury agrees or an appellate court decides that the prosecution has not proved its case” for imposing the death penalty.
 
 Bullington,
 
 451 U.S. at 443, 101 S.Ct. 1852.
 

 The procedure that resulted in the imposition of the sentence of life imprisonment upon petitioner Bullington at his first trial, however, differs significantly from those employed in any of the Court’s cases where the Double Jeopardy Clause has been held inapplicable to sentencing. The jury in this case was not given unbounded discretion to select
 
 *1180
 
 an appropriate punishment from a wide range authorized by statute. Rather, a separate hearing was required and was held, and the jury was presented both a choice between two alternatives and standards to guide the making of that choice. Nor did the prosecution simply recommend what it felt to be an appropriate punishment. It undertook the burden of establishing certain facts beyond a reasonable doubt in its quest to obtain the harsher of the two alternative verdicts. The presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment so precisely defined by the Missouri statutes.
 

 Bullington,
 
 451 U.S. at 438, 101 S.Ct. 1852. The Court agreed with the observation of a dissenter from the Missouri Supreme Court ruling under review in
 
 Bullington
 
 that the imposition of a life sentence after that defendant’s first trial meant that “ ‘the jury has already acquitted the defendant of whatever was necessary to impose the death sentence.’ ” 451 U.S. at 445, 101 S.Ct. 1852 (quoting
 
 State ex rel. Westfall v. Mason,
 
 594 S.W.2d 908, 922 (Mo.1980) (Bardgett, C.J., dissenting)).
 
 [2]
 

 In
 
 Arizona v. Rumsey,
 
 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), the defendant was convicted of murder and armed robbery. Consistent with Arizona law, the trial judge — without a jury — then conducted a sentencing hearing at which he heard evidence and argument regarding statutory aggravating and mitigating factors. Finding that there were no aggravating circumstances justifying a death sentence, the judge imposed consecutive sentences of life without parole for twenty-five years for the murder and twenty-one years’ imprisonment for the robbery. The Arizona Supreme Court rejected the defendant’s appeal of the consecutive sentences, but on the State’s cross-appeal it held that the trial judge had misinterpreted one of the statutory aggravating factors. It set aside the life sentence and remanded for resentencing. On remand, the defendant was sentenced to death.
 

 The Arizona Supreme Court reversed the death sentence, holding that the Double Jeopardy Clause prevented the defendant from being sentenced to death on remand.
 
 State v. Rumsey,
 
 136 Ariz. 166, 665 P.2d 48 (1983). The United States Supreme Court agreed. It noted that the Arizona capital sentencing proceedings were akin to a trial for purposes of the Double Jeopardy Clause, regardless of the fact that the sentencer in Arizona was the judge instead of a jury.
 

 The double jeopardy principle relevant to respondent’s case is the same as that invoked in
 
 Bullington:
 
 an acquittal on the merits by the sole decision maker in the proceeding is final and bars retrial on the same charge. Application of the
 
 Bullington
 
 principle renders respondent’s death sentence a violation of the Double Jeopardy Clause because respondent’s initial sentence of life imprisonment was undoubtedly an acquittal on the merits of the central issue in the proceeding — whether death was the appropriate punishment for respondent’s offense.
 

 Rumsey,
 
 467 U.S. at 211, 104 S.Ct. 2305. Further, the Court held that the result was not altered by the fact that when initially rejecting the death penalty the trial judge had relied on a misconstruction of a statutory aggravator. “Reliance on an
 
 *1181
 
 error of law,” the Court wrote, “does not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits.”
 
 Id.
 

 Finally, we have examined
 
 Sattazahn,
 
 587 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588. In that case, a Pennsylvania jury convicted the defendant of several offenses, including first-degree murder, and then heard evidence of aggravating and mitigating circumstances in a penalty-phase trial. Pennsylvania law required a verdict of death to be unanimous. Further, the trial court was authorized to discharge the jury if it became convinced that the jurors could not reach a unanimous agreement as to the sentence after further deliberation, in which case the court was required to impose a sentence of life imprisonment. In
 
 Sattazahn,
 
 the penalty-phase jury sent the judge a note advising that it was hopelessly deadlocked 9-3 in favor of a life sentence. The judge discharged the jury as hung and sentenced the defendant to life. After the defendant’s convictions were reversed because of errors in the jury instructions, he was retried and again convicted of first-degree murder. This time, he was sentenced to death.
 

 The
 
 Sattazahn
 
 majority held that the imposition of the death sentence after the defendant’s retrial was not prohibited. The Court emphasized that it is not the imposition of a life sentence, as such, that raises a double jeopardy bar. Rather, double jeopardy arises upon the defendant’s acquittal of the factors that would justify a death sentence.
 

 Petitioner here cannot establish that the jury or the court “acquitted” him during his first capital-sentencing proceeding. As to the jury: The verdict form returned by the foreman stated that the jury deadlocked 9-to-3 on whether to impose the death penalty; it made no findings with respect to the alleged aggravating circumstance. That result— or more appropriately, that non-result— cannot fairly be called an acquittal “based on findings sufficient to establish legal entitlement to the life sentence.”
 
 [Arizona v.] Rumsey,
 
 [467 U.S. 203,] 211 [, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984) ].
 

 Sattazahn,
 
 537 U.S. at 109, 123 S.Ct. 732. Neither did the trial court’s imposition of a life sentence acquit the defendant of the death penalty, the Court wrote. That sentence was mandated by law, not based on the resolution of factual matters, and therefore it did not establish an entitlement to a life sentence.
 
 Id.
 
 at 109-10, 123 S.Ct. 732.
 

 Upon our consideration of the principles set forth in the foregoing cases, it is apparent to us that the life sentence imposed following D’Arcangelo’s sentencing proceeding operated as an acquittal of the factors that would have warranted a death sentence. Florida’s capital sentencing scheme did and does require a separate sentencing proceeding before the trial jury. § 921.141, Fla. Stat. (1981). At the penalty-phase trial, evidence may be presented regarding any matter relevant to the nature of the crime and the defendant’s character, including but not limited to the aggravating or mitigating circumstances specified in the statute.
 
 Id.
 

 After hearing the evidence and deliberating, the penalty-phase jury is to render an “advisory sentence” based on its determination of the existence of sufficient statutory aggravating circumstances; the existence of sufficient mitigating circumstances that outweigh the aggravating circumstances found to exist; and, based on those considerations, whether the defendant should be sentenced to life imprisonment or death. § 921.141(2). Under the standard jury instruction adopted in 1981,
 
 *1182
 
 penalty-phase jurors are instructed that aggravating circumstances must be found to exist beyond a reasonable doubt.
 
 See
 
 Fla. Std. Jury Instr. (Crim.) Penalty Proceedings-Capital Cases (rev. June 1981);
 
 The Florida Bar re: Standard Jury Instructions Criminal Cases,
 
 477 So.2d 985, 988 (Fla.1985) (amending and quoting a portion of the 1981 Penalty Proceedings-Capital Cases instruction);
 
 Harich v. State,
 
 437 So.2d 1082, 1086 (Fla.1983) (quoting a portion of the 1981 Penalty Proceedings-Capital Cases instruction). The jury’s decision need not be unanimous, but a recommendation for the death penalty must be agreed to by a majority. Thus, a tie vote operates to recommend a life sentence.
 
 See
 
 Fla. Std. Jury Instr. (Crim.) Penalty Proceedings-Capital Cases (rev. June 1981);
 
 Harich,
 
 437 So.2d at 1086;
 
 Rose v. State,
 
 425 So.2d 521, 524-25 (Fla.1982),
 
 disapproved on other grounds by Williams v. State,
 
 488 So.2d 62 (Fla.1986).
 

 As mentioned, the penalty-phase jury’s sentencing verdict is advisory. It is not binding on the trial court, which must separately weigh the aggravating and mitigating circumstances and then impose a sentence of life imprisonment or death. § 921.141(3). If the court imposes a death sentence, it must set forth specific written findings of fact regarding the statutory aggravating and mitigating factors as well as the records of the trial and sentencing proceedings.
 
 Id.
 
 Although the court is not bound by the jury’s advisory sentence, a recommendation for a life sentence must be given great deference. In order for the court to override an advisory sentence of life, the facts suggesting a death sentence must be so clear and convincing that virtually no reasonable person could differ.
 
 Tedder v. State,
 
 322 So.2d 908, 910 (Fla.1975);
 
 see also Craig v. State,
 
 510 So.2d 857, 868 (Fla.1987) (observing that even when based on a tie vote, a jury recommendation of life is entitled to great deference).
 

 Thus it is clear that for purposes of applying double jeopardy under the
 
 Bull-ington
 
 and
 
 Rumsey
 
 principles, a penalty-phase proceeding in Florida is akin to a trial in which the State must prove its case for the death penalty, first to the jury and then to the trial court. The imposition of a life sentence following penalty proceedings is a determination that the State did not prove its case, and it is therefore an acquittal of the circumstances that would justify the death penalty. As such, it establishes the defendant’s entitlement to a life sentence for double jeopardy purposes. Indeed, the Florida Supreme Court has recognized that double jeopardy principles under both the Federal and Florida Constitutions apply to life sentences rendered in Florida’s capital sentencing proceedings.
 
 Wright v. State,
 
 586 So.2d 1024, 1032 (Fla.1991);
 
 Brown v. State,
 
 521 So.2d 110 (Fla.1988);
 
 see also Walls v. State,
 
 641 So.2d 381, 386 n. 1 (Fla.1994).
 

 In D’Arcangelo’s case, it makes no difference that the jury proceedings produced a tie vote. Unlike the situation in
 
 Sattazahn,
 
 penalty-phase jurors in Florida are not required to reach unanimous verdicts, and therefore they cannot be “hung.” As previously discussed, the D’Arcangelo jury’s tie vote constituted a recommendation for a life sentence.
 

 Further unlike
 
 Sattazahn,
 
 in this case the jury’s failure to reach a consensus did not legally obligate the trial court to impose a particular sentence. Although the court was required to give great deference to the jury’s advisory sentence, it remained duty bound to separately weigh the aggravating and mitigating circumstances and to enter the appropriate sentence. The court’s imposition of a life sentence effectively “acquitted” D’Arcan-gelo of the death penalty. Even if that life sentence were for some reason legally er
 
 *1183
 
 roneous, it created a double jeopardy bar to imposing the death penalty on D’Arcan-gelo in any future retrial.
 
 See Rumsey,
 
 467 U.S. at 211, 104 S.Ct. 2305;
 
 see also Brown,
 
 521 So.2d at 112 (holding that double jeopardy barred imposition of death sentence at defendant’s retrial after first trial judge had erroneously concluded that defendant was ineligible for death penalty, discharged jury at start of penalty-phase, and sentenced defendant to life imprisonment);
 
 Williams v. State,
 
 595 So.2d 936 (Fla.1992) (holding life sentence imposed after trial judge erroneously allowed defendant to waive penalty-phase jury without State’s consent bars later imposition of death sentence).
 

 E. Conclusion.
 

 The State having revised its view and conceded that double jeopardy would bar the imposition of the death penalty on D’Arcangelo in- a future retrial, and this court having separately concluded as much, it appears that D’Arcangelo’s petition for writ of certiorari is moot. For that reason, we deny it.
 

 Petition denied.
 

 SILBERMAN, C.J., and DAVIS, J., Concur.
 

 [1]
 

 . Arguably, the question of whether D'Arcan-gelo’s trial would have produced a different result if the CBLA evidence had not been admitted comes closer to the kind of factual issue contemplated in
 
 Carter.
 

 [2]
 

 . Robert Bullington was the capital murder defendant whose retrial was at issue in
 
 Mason;
 
 he petitioned the United States Supreme Court for review of the Missouri Supreme Court's decision.
 
 Bullington v. Missouri,
 
 449 U.S. 819, 101 S.Ct. 70, 66 L.Ed.2d 21 (1980).