787 So.2d 786 (2001)
James Franklin ROSE, Appellant,
v.
STATE of Florida, Appellee.
No. SC94317.
Supreme Court of Florida.
April 5, 2001.
Rehearing Denied June 4, 2001.
*789 Richard L. Rosenbaum, Fort Lauderdale, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon James Franklin Rose. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the trial court's judgment and sentence of death.

PROCEDURAL POSTURE
James Franklin Rose was indicted for the kidnapping and first-degree murder of eight-year-old Lisa Berry in November 1976. Rose's first trial resulted in a mistrial because the jury could not reach a verdict. On retrial, he was convicted of both counts and sentenced to life on the kidnapping count and death on the murder count. This Court affirmed both of his *790 convictions but vacated the death sentence. See Rose v. State, 425 So.2d 521 (Fla.1982). The Court found the trial court erred during the penalty phase in giving an improper "dynamite" or "Allen charge"[1] after the jury sent the following note to the judge: "We are tied six to six, and no one will change their mind at the moment. Please instruct us." We held that the trial court erred in failing to recognize that where seven jurors fail to vote to recommend death, the jury recommendation is for life. The case was remanded for a resentencing. See id. at 525.
At resentencing the new jury recommended a death sentence by a vote of eleven to one, and the trial court sentenced Rose to death. This Court affirmed the sentence. See Rose v. State, 461 So.2d 84 (Fla.1984). Following the Governor's subsequent issuance of a death warrant, Rose petitioned this Court for a writ of habeas corpus and a motion to stay his execution, asserting, among others, claims of ineffective assistance of appellate counsel. This Court denied relief. See Rose v. Dugger, 508 So.2d 321 (Fla.1987). Thereafter, Rose filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, alleging ineffective assistance of counsel at both the guilt and penalty phases of his trial. The trial court summarily denied the motion without conducting an evidentiary hearing but this Court reversed, and directed the trial court to hold an evidentiary hearing. See Rose v. State, 601 So.2d 1181 (Fla.1992).
After holding an evidentiary hearing, the trial court again denied all relief. Thereafter, this Court affirmed the trial court's denial of the claim of ineffective assistance of counsel at the guilt phase. See Rose v. State, 675 So.2d 567 (Fla.1996); however, we reversed the trial court's ruling with regard to the penalty phase ineffectiveness of counsel and remanded for a new sentencing. See id. at 569. Pursuant to this Court's reversal, a new jury was selected and penalty phase proceedings were held. At the close of this latest penalty phase, the jury recommended death by a vote of nine to three. After the jury's recommendation, sentencing memoranda were submitted by the parties and victim impact evidence was presented to the judge at a Spencer[2] hearing. On February 13, 1998, the trial court sentenced Rose to death. Rose now appeals and raises seventeen issues for review in this appeal from his sentencing.[3]

*791 FACTS
The essential facts of this case are described in this Court's opinion on Rose's first direct appeal:
Although circumstantial in nature, the evidence was sufficient for the jury to have found beyond a reasonable doubt that defendant, and no other person, kidnapped and murdered eight-year-old Lisa Berry. The evidence reveals that defendant was the last person to be seen with Lisa at the bowling alley on the night she disappeared. Barbara Berry, Lisa's mother, was at the bowling alley with family and friends when defendant arrived shortly after 9 p.m. on October 22, 1976. According to Barbara, defendant joined her and other team members at the bowling circle where they talked for several minutes. Shortly after 9:30 p.m., defendant said that he was going to the poolroom area of the bowling alley. Lisa told her mother that she was going with him. Defendant and Lisa were last seen by Lisa's sister Tracy, who testified that Lisa was outside the front door of the bowling alley and defendant was standing just inside the front door. Defendant gave Tracy money for cokes, but when she returned from the snack bar with the cokes, both defendant and Lisa were gone. Upon being informed by Tracy that she could not find defendant and Lisa, Barbara attempted to find them. While looking for them, she was paged for a telephone call which turned out to be from defendant. He asked Barbara the time; she said 10:30. He responded that it was 10:23. He asked what time she would be finished bowling; she said 11:30. Defendant was next seen entering the bowling alley at approximately 11:30 p.m. The medical examiner's testimony established the time of Lisa's death to be within twenty-four hours either side of 1 a.m., October 23, 1976.
The evidence reveals that defendant had a motive for killing Lisa. Although he and Lisa's mother had dated for about nine months, they were no longer dating regularly because he was extremely jealous about her working in the bowling alley bar and being around other men. Lisa's mother testified that defendant told her that he could hurt her and that she did not know what he was capable of doing. A male friend of Barbara's who was at the bowling circle when defendant was there was asked by Lisa if he was going to have breakfast with her and her mother. According to testimony at trial, defendant, after having overheard this conversation had a look on his face as if to say, "What is going on?"
Several people present at the bowling alley testified that when defendant returned at approximately 11:30, he had a large red spot on his lower right trousers leg. Expert testimony revealed the spot to be type B blood. Type B bloodstains also were found on the outside of the passenger's door of defendant's white van, on the passenger's seat, and on the engine cover. Fingernail scrapings taken from defendant revealed blood. It was stipulated in the record that Lisa had type B blood and that defendant had type A blood.
At about 11:45 p.m. on the night Lisa disappeared, a white van was seen behind a Pantry Pride store located about a quarter of a mile from the bowling alley. Defendant was seen driving his white van that same night. According to testimony at trial, when the search for Lisa began shortly after defendant's *792 return to the bowling alley at 11:30, he drove away and returned at least three times. Lisa's green sweater and pink pants were found the next afternoon behind the Pantry Pride. Her pink blouse was later found in defendant's van. Lisa's nude body was found four days after her disappearance in a canal approximately ten miles from the bowling alley. Her shoes were found about a mile apart alongside a road between the canal and the bowling alley.
A paint-stained hammer was found in the canal about six feet from Lisa's body. Defendant was a painter, and expert testimony revealed that paint samples from the hammer were similar to paint samples taken from paint cans in his van. The medical examiner testified that Lisa's death resulted from severe head injuries caused by blunt force.
Expert witnesses also testified that a green fiber taken from defendant's clothing after his arrest was consistent with fibers from Lisa's green sweater found behind the Pantry Pride and that a crushed hair taken from defendant's sock was consistent with hair from Lisa's hairbrush.
Defendant made numerous inconsistent attempts to account for his whereabouts on the evening Lisa disappeared and to explain away certain evidence. Defendant told Lisa's mother that he was at the Highway Bar when he telephoned her regarding the time and stated to her that it was 10:23. He was uncharacteristically exact about the time, and he could be clearly heard without background noise which, according to testimony, would not have been possible had he been at the bar when he telephoned since the band at the bar would have been playing loudly at that particular time.
When defendant returned to the bowling alley at 11:30, he pretended that Lisa was still alive. Acting as though Lisa was present at the bowling alley in his visible sight, he commented to Lisa's mother that Lisa was getting chubby and asked who was the person with the goatee to whom Lisa was talking. When she turned around to see who defendant was referring to, she saw neither Lisa nor a person with a goatee.
After initially denying that the spot on his trousers leg was blood, defendant later explained that he had cut himself changing a tire. Testimony indicated the spare tire was fully inflated. He told a police officer that he had cut his leg while crawling underneath the van to check out a noise he had heard. When the officer took defendant to the area where he claimed to have crawled under the van, the officer could not find any impressions in the sand that could have been made by a human body.
In an attempt to cover the blood spot on his trousers which was first noticed and called to his attention upon his return to the bowling alley at 11:30, defendant first covered it with a whitewash or paint. Later, after he went into a restroom, the spot was covered with grease or some black substance. Defendant explained to a police detective that the blood on the seat of his van was from an injured friend whom he had taken home about two months earlier. The friend had type A blood. The blood on the seat was type B, the same as Lisa's.
Defendant, at one point, told police detectives that Lisa had last been near the van about two weeks prior to the night of her disappearance. He later stated that Lisa had attempted to get into the van earlier that evening and he told her to get out. Lisa's mother testified that Lisa had not been in defendant's van for about a year.

*793 Defendant was convicted for the kidnapping and first-degree murder of Lisa Berry.
Rose, 425 So.2d at 522-23.

PENALTY PHASE HEARING
In the most recent penalty phase, the State presented evidence through the medical examiner, Dr. Abdullah Fatteh, relating to the time, cause and manner of the victim's death. He testified that despite the decomposed state of the victim's body, he was able to determine that she died of severe head injuries. The external injuries included a fracture at the base of her skull and cerebral hemorrhage. The nature of the hemorrhage indicated that the blows were sustained while she was still alive. He also testified that the injuries to the back of the head were caused by the side or blunt end of a hammer or possibly by the kicking of the victim's head by an adult wearing shoes. Dr. Fatteh initially testified that death likely occurred within minutes to no longer than an hour after the injuries. However, on cross-examination he stated that she probably died within four to eight minutes.
Sergeant Dennis Walker, one of the first to arrive at the bowling alley in response to the missing person call, testified that he encountered Rose and could smell alcohol about Rose's body and that Rose "appeared to be under some influence, but [he] wouldn't say drunk," as he was cooperative and polite. Retired Detective Arthur McLellan, who got there at approximately the same time as Sergeant Walker, testified that he did not smell alcohol about Rose's person and felt that Rose was sober. Detective Edward, who interviewed Rose on October 23, 1976, the day after the killing, testified that Rose told him that he momentarily left the bowling alley to get a drink at a local bar and then left the bar after getting the drink. The bartender on duty, however, testified that she did not see Rose at the bar that night. Rose's former probation officer, Charles Dickun, testified that Rose and everyone he interviewed who knew Rose indicated that Rose had an alcohol problem. Dickun's testimony, however, did not pertain to the night of the killing.
Rose presented four witnesses in mitigation. Three testified about his personality and good nature. Judy Greear had known Rose for twenty-four years and had lived with him in 1975. She testified that he was a good man and good to her two children. She added that although Rose was jealous, she had never observed any act of violence on his part. Floyd Templeton, whom Rose worked for as a painter, testified that Rose was honest, trustworthy, and his best worker. Floyd and Mrs. Templeton testified that they trusted Rose with their grandchildren as he used to always play with them when he came over to their home.
The last witness for Rose, Dr. Jethrow Toomer, a mental health expert, presented extensive testimony regarding Rose's troubled history and mental problems. He testified that Rose was born out-of-wed-lock and never knew his biological father, who apparently abandoned him a few months after birth. Rose's subsequent relationship with a stepfather was not supportive or nurturing, but was in fact hostile and lacking of any emotional support. Dr. Toomer performed several mental tests upon Rose and testified that the results suggested the likelihood of some organic impairment or brain damage, due in part to two head injuries Rose had suffered from falls, including one from a ladder. He pointed out that Rose had always been a slow learner as evinced by the fact that he was retained in fourth, fifth, and seventh grades of school and then dropped out of school entirely. Rose had scored an *794 eighty-nine on an IQ test and Toomer concluded that Rose suffered the effects of a borderline personality disorder.
On cross-examination, the State undermined many of the points made by Dr. Toomer regarding Rose's mental and emotional state before, during, and after the commission of the murder. The State brought up the fact that a more recent IQ test administered to Rose while in prison produced a score of ninety-nine. The State also presented Dr. Toomer with psychological reports performed in the 1970's by other doctors. Two of the reports, performed in 1971 and 1976, concluded that Rose was a sociopath, while another done in 1973 concluded there was no evidence of psychosis or acute emotional distress. Other findings in the reports indicated that Rose's memory was intact, he was an outgoing person, and he was of average intelligence. The State also suggested in its questioning that Dr. Toomer failed to consider important information in arriving at his findings. For instance, Dr. Toomer conceded he never talked to any of the doctors who performed the earlier examinations of Rose. The State also established the doctor's failure to talk to individuals who were close to Rose to get insights on his personal relationships.
Subsequent to the penalty phase trial and the jury's recommendation of death, the court held a Spencer hearing wherein victim impact evidence was presented by the State. Ms. Margaret Szabo, the victim's grandmother, testified about the hardship involved in having to relive this experience and wondered what the victim could have become with her intelligence, compassion and personality. The other witness, Ms. Berry, the victim's mother, testified about her perpetual pain and grief in having to continually go through this process. She also echoed the testimony regarding the victim's intelligence, love, and leadership at such a young age. After the hearing, the trial court sentenced Rose to death.

Photographic Evidence
We address first Rose's claim that reversal is required because the photographs of the victim were gruesome and prejudicial beyond any value as relevant evidence.
As recently stated in Zack v. State, 753 So.2d 9, 16 (Fla.2000), relevant evidence is ordinarily admissible unless it is barred by a rule of exclusion or its admission fails a balancing test to determine whether the probative value is outweighed by its prejudicial effect. This standard is equally applicable to photographs. See Pangburn v. State, 661 So.2d 1182, 1188 (Fla.1995). Hence, we have held that autopsy photographs, even when difficult to view, are admissible to the extent that they fairly and accurately establish a material fact and are not unduly prejudicial. See id. Absent a clear showing of abuse of discretion by the trial court, a ruling on admissibility of such evidence will not be disturbed. See Gudinas v. State, 693 So.2d 953, 963 (Fla.1997).
The State presented the testimony of the medical examiner, Dr. Fatteh, who testified about his findings regarding the crime scene and the manner and cause of the victim's death. As he attempted to explain injuries sustained by the victim, the State offered two photographs purportedly depicting the injuries, including a fracture at the base of the victim's skull. Defense counsel immediately objected, asserting that the photographs were unnecessary and irrelevant since the defendant had already been convicted of the murder. The trial court allowed the photographs.
We find no abuse of discretion in the trial court's action. First, we agree with the State that the photographs could be used to illustrate the extent of the victim's *795 injuries and to familiarize the sentencing jury with the facts of the case. See generally Charles W. Erhardt, Florida Evidence § 401.2, at 108 (1999 ed.) (stating that photographs are admissible both for illustrative and independent evidentiary value). After all, this jury was not the jury at the guilt phase which took place years before the latest sentencing proceedings. Thus, the State had a proper interest in familiarizing this new jury with the cause of the victim's death and the nature of the fatal wounds.
It appears that the photographs were also relevant to the establishment of the HAC (heinous, atrocious and cruel) aggravator claimed by the State. For example, there was a question as to whether the victim's skull fracture resulted from a direct injury or the skull became split after submersion in the canal for several days. Consistent with Pangburn, 661 So.2d at 1188, and Gudinas, 693 So.2d at 963, these asserted reasons were sufficient to support the trial court's rulings and we find no error.

Brady Violation
In issue two, Rose argues the State improperly withheld autopsy photographs until the current proceedings in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he argues that the withheld photographs should have been disclosed earlier because they would have been relevant in establishing a more favorable time of death as it relates to the State's assertion of the HAC aggravator. Although this claim appears to constitute a Richardson claim as well as a Brady issue we find no reversible error under either analysis.
The United States Supreme Court has recently provided the following three-prong analysis when determining the merits of a Brady violation claim:
The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). With regard to the third prong, the Court emphasized that prejudice is measured by determining "whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. at 290, 119 S.Ct. 1936. In applying the foregoing test, the evidence must be considered in the context of the entire record. See Sireci v. State, 773 So.2d 34 (Fla.2000) (citing State v. Riechmann, 777 So.2d 342 (Fla.2000), and Haliburton v. Singletary, 691 So.2d 466, 470 (Fla.1997)).
The crux of the controversy here involves the late discovery of photographs which purportedly depict one of the injuries suffered by the victim. As previously mentioned, Dr. Fatteh testified that the victim suffered a fracture at the base of her skull. In order to illustrate the nature of the injuries, including this fracture, the State presented Dr. Fatteh's testimony along with certain photographs, the admissibility of which was challenged and addressed in issue 1, supra. However, these photographs are not at issue in the Brady claim. The photographs claimed to be a violation of Brady consist of two sets, one containing two prints of the victim's skull, and another containing sixteen other autopsy photographs, totaling in all eighteen prints. Rose argues the two-print set could be used to show that the fracture resulted not from a head injury, but instead from the erosion of that part of the skull by the work of maggots who had invaded the decaying body in the days after death.
*796 Starting with Strickler's first prong, we agree the photographs were in fact material in rebutting the State's evidence of the HAC aggravator.[4] To the extent that these two photographs might have shown that the victim died very quickly, they might have negated the State's theory on HAC. The second prong of Strickler was met here as well. These two sets of photographs curiously surfaced in the most recent penalty phase. Because of this late disclosure, the trial court held a Richardson hearing. Although it is not altogether clear, the prosecutor testified that he only became aware of the photographs just a week before the hearing and he immediately gave copies to Rose's counsel. Dr. Robert Hinman and Dr. Joshua Perper, members of the medical examiner's office in Broward County who performed the autopsy at the time of the crime, testified as well. At some point, Dr. Perper, who was not totally sure of the existence of a fracture, inquired about the shots depicting the maggots covering the victim's head, but could not locate them. Dr. Hinman then remembered that negatives were kept at the morgue office, went there and found the negatives.
As provided by Strickler, even where the prosecutor does not know about the existence of the exculpatory material, a suppression may still be deemed to have occurred if the State's agents possess the evidence and it is not disclosed. In this instance, the medical examiner for the State on this case became aware of the photographs in the State's possession but did not disclose them to defense counsel; thus, for the purposes of analysis the photographs appear to have been withheld.
However, Strickler's third and dispositive prong has not been met. As asserted, the utility of these photographs would have gone toward establishing some time line in rebutting the HAC aggravator. Nonetheless, it does not seem that the evidence would have established how long it took for the victim to die beyond what was estimated by the medical examiner in his testimony. Even assuming that the skull fracture resulted from the maggots eating out the particular part of the victim's skull and not from a direct impact to the head, it is hard to see how that establishes a quicker death for the victim. In other words, the photographs would have done very little in either confirming or negating Dr. Fatteh's testimony that the death occurred within four to eight minutes of the head injuries.
More importantly, as part of the Richardson process, the trial court offered to allow trial counsel as much time as necessary to go over the two pictures with Dr. Wright, a defense witness, on manner and cause of death, but counsel refused. Counsel appeared concerned that, because of their gruesome nature, the use of the photographs before the jury would have actually hurt his client. Accordingly, in addition to the fact that the photographs were of questionable relevancy to rebut HAC, the fact that counsel tactically chose not to use this material undermines any claim of prejudice. See Way v. State, 760 So.2d 903 (Fla.2000) (affirming denial of postconviction relief where photographic evidence did not put the case in such different light as to undermine confidence in proceeding).[5]

*797 Failure to Rule Upon Richardson Hearing

In issue three, Rose argues that the trial court erred in failing to rule on the Richardson issue. We disagree. As a general rule, the failure of a party to get a timely ruling by a trial court constitutes a waiver of the matter for appellate purposes. See Richardson v. State, 437 So.2d 1091, 1094 (Fla.1983). As just mentioned above, the trial court held a hearing regarding the late discovery of the two sets of photographs. Although it could not be determined whether the State wilfully committed improprieties regarding the late discovery of the photographs, Rose's counsel realized that the use of these photographs would have at best had the effect of a double-edged sword because of their gruesome nature. In a tactical move, Rose's counsel decided not to use the photographs and not to call his own expert despite the trial court's urging. Trial counsel's decision effectively resolved the matter and any failure of the court to formally rule was rendered harmless. See Richardson, 437 So.2d at 1094.

Prosecutorial Comments Made During Closing
In issue four, Rose argues the prosecutor engaged in an improper closing argument in commenting on what he believed the victim might have said. While we have cautioned against arguments "imagining" what may have happened to a victim, we have held that wide latitude is afforded counsel during arguments. See Moore v. State, 701 So.2d 545, 550 (Fla. 1997). In order to get a new trial on this ground, the comments "must either deprive the defendant of a fair and impartial trial ... or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." Spencer v. State, 645 So.2d 377, 383 (Fla.1994). Still, it is within the trial court's discretion to control the comments made to a jury and the court's decision will not be disturbed absent an abuse of discretion. See id.
At closing, the prosecutor commented:
So you know who the last person to see Lisa alive was, as shown by the evidence? James Franklin Rose. And he takes this little eight-year-old girl in his van to somewhere. And don't you know, drawing on your own human experience and common sense, she probably wanted to know where are we going? My mother's at the bowling alley.
(Record on Appeal, Vol. XIV, at 1410-11). Defense counsel immediately objected and the trial court sustained the objection. Trial counsel did not seek a mistrial. We conclude these comments are not so egregious or fundamental as to warrant reversal. We conclude the prosecutor's remarks were harmless. See James v. State, 695 So.2d 1229, 1234 (Fla.1997) ("[W]e conclude that the prosecutor's poorly phrased comment was a harmless error as there is no possibility that it contributed to the outcome in this case."). In addition, this claim is procedurally barred for Rose's failure to move for a mistrial after the trial court sustained the objection. See James, 695 So.2d at 1234 ("The issue is preserved if the defendant makes a timely specific objection and moves for a mistrial.") (emphasis added). This procedural rule is intended to require counsel to act if she believes the error truly merits an end to the trial. Counsel did not act here.

*798 Cross-Examination of Rose's Mental Health Expert

In issue five, Rose argues that the prosecutor engaged in misconduct by inappropriately discrediting Rose's mental health expert, Dr. Toomer, during cross-examination. Generally, matters affecting the credibility of a witness may be inquired into on cross-examination. See Chandler v. State, 702 So.2d 186, 195-96 (Fla.1997). As a form of impeachment, section 90.608(1), Florida Statutes (1997), provides, for example, that any party may attack the credibility of a witness by showing that the witness is biased. We have in fact recognized a host of matters upon which cross-examining counsel may inquire in demonstration of bias, including, for instance, the frequency with which a defense expert testifies for capital defendants. See Henry v. State, 574 So.2d 66, 71 (Fla.1991).
During the proceedings below, Dr. Toomer provided lengthy testimony regarding Rose's emotional and mental history. On cross-examination, the State asked questions relating to Dr. Toomer's prior testimony for other defendants and other questions relating to his qualifications. Contrary to Rose's arguments, we conclude the questions asked by the State were within the broad range of permissible cross-examination. In fact, this line of questioning is almost identical to the one in Henry. See id. To the extent that this Court found this inquiry relevant in demonstrating the expert's bias in Henry, we conclude that the trial court did not abuse its discretion in allowing the questions here.

State's Elicitation of Improper Testimony on Sexual Assault
In issue six, Rose argues that the trial court erred in allowing the State to introduce evidence suggesting the decedent had been the victim of a sexual assault. Rose states that clearly there was no such evidence and the related testimony should not have been allowed. As earlier mentioned, Dr. Fatteh was the State's main witness in establishing the cause and manner of death. At one point, he was asked by the State about oral, vaginal, and rectal swabs taken from the victim. Defense counsel immediately objected and a sidebar was had. Defense counsel was concerned that the State was attempting to present some evidence of sexual contact to the extent that Dr. Fatteh would testify that though he could not find any evidence of sexual abuse, he could not exclude the possibility. The State then submitted that in a conversation with a detective at the jail, Rose worried: "This is so bad. What will everybody think about me because she was raped and everything." The State suggested that though the admissibility of the statement was doubtful, it was relevant as a proper predicate for HAC. However, the trial court disagreed with the State and ruled that the statement along with any other sexual abuse reference would not be allowed unless the State had a witness that would (1) establish that there was sexual contact and (2) such contact occurred prior to the death.
At issue on appeal is whether the State violated the judge's rulings through subsequent inquiries made by the State of Detective Charles Tipton and Detective Edward King:
[State]: I would like to show you what is in evidence as State's Exhibit 6 and State's Exhibit 7, and ask you if these appear familiar to you?
[Det. Tipton]: This is the sweater and the slacks that I took pictures of.
[State]: Okay, sir. Now, when you took custody of the slacks, were they in simply the same situation, condition they are now?

*799 [Det. Tipton]: Yes.
[State]: Including the zipper?
[Det. Tipton]: Right
(Record on Appeal, Vol. VIII, at 778). Detective King, who participated in the questioning of Rose for the murder and who was also the arresting and investigating officer in Rose's burglary case in 1969, took the stand for the State. The relevant part of his testimony was as follows:
[State]: ... Do you know if he had been charged with any other burglaries after the one that you arrested him for?
[Det. King]: My own personal knowledge?
[State]: Yes.
[Det. King]: No.
[State]: Or do you know from any other source?
[Det. King]: Yes. I heard from other sources that he was arrested in Wilton Manors.
[State]: Do you know for what?
[Det. King]: Supposedly broke into a didn't break into the house. He knew a white female and it was the wife of a friend of his, supposedly somebody that he knew, and he went there and apparently took advantage of her and either tried to rape her or
[Defense counsel]: Objection as to the words "took advantage of her."
[Court]: That's sustained.
[Defense counsel]: I would move to strike.
[Court]: The jury will disregard that phrase.
[State]: But you don't have personal knowledge of that?
[Det. King]: I don't have much information. I just heard that he was involved in a possible rape there.
[Defense counsel]: Objection to "possible rape," Judge.
[Court]: Next question.
(Record on Appeal, Vol. IX, at 932-33). As shown above, counsel objected only to Detective King's examination, and therefore his claim relating to Detective Tipton's testimony was not preserved. See J.B. v. State, 705 So.2d 1376, 1378 (Fla. 1998) (holding that except where a fundamental error exists, to raise an error on appeal, a contemporaneous objection is required at the trial level when the alleged error occurred). Similarly, the objections made during King's testimony appear inadequate to preserve the issue for appeal. In any case, after examining the challenged testimony, we find any error to be harmless at most.[6]

Ex Post Facto Violation in Use of Aggravator
In issue seven, Rose argues that the trial court erred in allowing the State to present evidence of and rely upon the aggravator that the victim was twelve years old pursuant to section 921.141(5)(1), Florida Statutes (1997). He contends that this aggravator was enacted well after the commission of the crime and the trial. Thus, the introduction of this aggravator and consideration by the jury constitutes a violation of ex post facto principles, requiring a new penalty phase or alternatively a reduction of his sentence to life.
Below, the State was allowed to argue that "the victim of the capital felony was a person less than twelve years of age." *800 § 921.141(5)(l), Fla. Stat. (1997). Rose unsuccessfully objected to this aggravator on the ground that it was enacted in 1995, well after the crime was committed in 1976, and therefore, its introduction violates ex post facto principles. In fact, soon after Rose's sentencing, we issued State v. Hootman, 709 So.2d 1357, 1360 (Fla.1998), holding, consistent with Rose's arguments at resentencing, that the retroactive application of an aggravator indeed constitutes an ex post facto violation and is therefore impermissible. Immediately after the release of Hootman, Rose filed with the trial court Defendant's Second Motion to Correct Sentencing Error pursuant to Florida Rule of Criminal Procedure 3.800(b) or Motion for New Sentencing Hearing. After full consideration of the crime, the trial court performed a harmless error analysis and held that in light of the remaining aggravating circumstances, death was still the proper sentence and the invocation of the improper aggravator had had no possible effect on the sentencing proceedings.
Recently in Lukehart v. State, 762 So.2d 482, 501 (Fla.2000), we decided a similar issue wherein the Court found that the Legislature, in amending section 921.141(5)(a), Florida Statutes, to include the phrase "or on probation," altered the substantive law by adding an entirely new aggravator to be applied upon the defendant. Though we found an ex post facto violation in Lukehart, we applied a harmless error analysis and rejected Lukehart's claim in light of the fact that the jury was already aware that he was on probation when he committed the crime, and in view of the remaining aggravators there. See id.; see also Zack v. State, 753 So.2d 9, 25 (Fla.2000) (finding harmless error in light of remaining aggravators). Much as in Lukehart, the jury here was aware at all times that the victim was eight years old at the time of death. We find no error in the trial court's harmless error analysis.

Prior Violent Felony Aggravator
In issue 8 Rose argues the court gave undue weight to the prior violent felony aggravator because the predicate felony did not involve a threat of violence. Section 921.141(5)(b), Florida Statutes, provides: "The defendant was previously convicted of another capital felony or another felony involving the use or threat of violence to the person." We have held that the "finding of a prior violent felony conviction aggravator only attaches `to life-threatening crimes in which the perpetrator comes in direct contact with a human victim.'" Mahn v. State, 714 So.2d 391, 399 (Fla.1998). Further, we have provided that whether a crime constitutes a prior violent felony is determined by the surrounding facts and circumstances of the prior crime. Gore v. State, 706 So.2d 1328, 1333 (Fla.1997).
We find sufficient support in the record for the finding of this aggravator. First of all, there are two prior felonies at play here. In November 1969, Rose was placed on probation for breaking and entering of a dwelling with intent to commit grand larceny. His probation was subsequently revoked and he was then adjudicated guilty and was sentenced to a prison term. In 1971 he was convicted for breaking and entering a dwelling with intent to commit a rape (presumably the event which triggered the violation of probation since the sentence was to run concurrent with the sentence of the 1969 case, but that is not stated in the record). He was later released on parole, during which he committed the murder under review.
The State presented evidence that there was some violence in the commission of the crime in the 1969 case. The detective who investigated the 1969 case testified that Rose entered the victim's apartment in the middle of the night and covered her mouth *801 with his hand as he threatened to kill her if she made any noise. He then shoved her to the floor on his way out of the apartment. The victim suffered some minor injuries from the incident. These circumstances are consistent with a "life-threatening crime in which the perpetrator comes in direct contact with a human victim." Mahn, 714 So.2d at 399. Therefore, we conclude the prior violent felony aggravator was properly established.
On a related claim, Rose also argues that the prior violent felony aggravator was actually impermissibly doubled and improperly used against him twice. The consideration of two aggravating circumstances, referred to as doubling, is improper when the aggravators are based upon the same aspect of the crime. See Banks v. State, 700 So.2d 363, 367 (Fla. 1997). However, the facts in a given case may support multiple aggravating factors "so long as they are separate and distinct aggravators and not merely restatements of each other, as in murder committed during a burglary or robbery and murder for pecuniary gain, or murder committed to avoid arrest and murder committed to hinder law enforcement." Id.
In the current case, the State argued and the trial court found the existence of the aggravators that (1) the crime for which the defendant was to be sentenced was committed by someone previously convicted of a felony and under a sentence of imprisonment or on parole and (2) the defendant was previously convicted of a felony involving the use or threat of violence. Contrary to Rose's argument, we find no error in the trial court's findings. In Hildwin v. State, 727 So.2d 193, 196 n. 3 (Fla.1998), the defendant had been convicted of rape and was on parole at the time of the commission of the murder. The defendant there argued, as Rose presently does, that the concurrent use of the prior violent felony and parole aggravators constituted improper doubling. We rejected the argument. See id. at 196. Likewise, we reject Rose's contention here.

Kidnapping Aggravator
In issue nine Rose argues that undue weight was given to the aggravator that the capital felony was committed while the defendant was engaged in the commission of or attempt to commit a kidnapping. As pointed out by the State, this issue was previously resolved unfavorably to Rose when we affirmed his conviction on the murder and the kidnapping counts. See Rose, 425 So.2d at 523. Hence, that legal issue has already been decided.

HAC Aggravator
In issue ten Rose argues the trial court erred in finding that the capital felony was especially heinous, atrocious, or cruel. As provided by section 921.141(5)(h), Florida Statutes, the fact that a capital felony is especially heinous, atrocious, or cruel is an aggravator. We have provided that this aggravator attaches "only in torturous murders-those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Guzman v. State, 721 So.2d 1155, 1159 (1998). The crime must be conscienceless or pitiless and unnecessarily torturous to the victim. See id.
As reflected by the record and the trial court's order, there is sufficient evidence to support the finding of this aggravator. Though the exact time of death could not be determined, the State asserts that the young victim was aware of her fate during her abduction and in the moments leading to her death. For example, the State asserts that this was established by the fact that the victim was found in the *802 canal and no blood was found on the clothes she wore that night. The State claims this indicates that Rose removed her clothes before applying the fatal blows. As stated by Dr. Fatteh, had she been wearing her clothes at the time of the blows, some blood would have landed on some part of her clothes. Therefore, it was proper for the jury to have inferred that, though the exact time it took for the victim to die was unknown, the victim consciously suffered anguish prior to the striking of the fatal blows. See, e.g., Wyatt v. State, 641 So.2d 1336, 1340 (Fla. 1994).

Consideration of Mental Mitigation
In issue eleven Rose argues that the trial court's finding on mitigation that Rose was not under the influence of extreme mental or emotional disturbance at the time of the offense is unsupported by the record. A great deal of unrebutted evidence, he advances, was presented to this effect, including his out-of-wed-lock birth, his troublesome childhood, his low IQ, his diagnosis of a borderline personality disorder, his neurological impairments, brain damage, and the evidence of intoxication on the night of the murder. Rose also argues that the court erred in refusing to accord each of the remaining mitigating circumstances greater weight.
Dr. Toomer testified extensively for the purpose of establishing the following statutory mitigators: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance, and (2) the capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired.[7] He testified that Rose suffered from a borderline personality disorder which caused him to do well for short periods of time but, because of his lack of coping skills and alcohol problem, resulted in his criminal problems. He also testified that tests results suggested the likelihood of some organic impairment or brain damage.
With regard to a trial court's finding of a mitigating circumstance, we have held:
The decision as to whether a mitigating circumstance has been established is within the trial court's discretion. Moreover, expert testimony alone does not require a finding of extreme mental or emotional disturbance. Even uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case. As long as the court considered all of the evidence, the trial judge's determination of lack of mitigation will stand absent a palpable abuse of discretion.
Foster v. State, 679 So.2d 747, 755 (Fla. 1996) (citations omitted).
At first glance, the testimony paints a disturbing picture of Rose's emotional and mental state. Undoubtedly, we have found such circumstances to be of a significantly mitigating character. See, e.g., Hawk v. State, 718 So.2d 159, 162 (Fla. 1998) (clinical and statistical evidence of brain damage, mental illness, and intoxication at the time of crime constituted strong mitigation requiring reversal of death sentence). However, as stated in Foster, the trial court was not bound to find the submitted mitigators simply because of Dr. Toomer's testimony. Foster, 679 So.2d at 755. A close review of the *803 record reveals that the State successfully attacked Dr. Toomer's findings through a combination of factors including: Rose's score of a ninety-nine on his most recent IQ test in prison; the rebuttal of Dr. Toomer's finding of a borderline personality disorder by the State's theory that Rose was a sociopath, as supported by various psychological reports done in the 1970's; indications from the reports that Rose's memory was intact, he was an outgoing person, and was of average intelligence; Dr. Toomer's oversight in not contacting any of the various doctors who had previously examined Rose; and Dr. Toomer's failure to interview any of the individuals closest to Rose. Considering this impeachment the trial court did not abuse its discretion on this point. See id.
Testimony was also presented regarding whether Rose was intoxicated on the night of the murder. Sergeant Walker testified that Rose "appeared to be under some influence, but [he] wouldn't say drunk," as he was cooperative and polite. Detective McLellan, who was there at the same time as Sergeant Walker, however, testified that he did not smell alcohol about Rose's person and felt that he was sober. The bartender at the bar Rose stated that he had gone to that night testified that she did not see him that night. Once again, the trial court did not abuse its discretion on this point. See Foster, 679 So.2d at 755.

Victim Impact Testimony
In issue twelve Rose argues the trial court abused its discretion in admitting testimony from family members of the decedent and in allowing the decedent's mother to remain in the courtroom throughout the sentencing phase proceedings over defense objection.
Section 921.141(7), Florida Statutes (1997), provides:
Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence. Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.
This Court has previously recognized this statute and approved the presentation of victim impact evidence while counseling restraint in its proper use. See Mansfield v. State, 758 So.2d 636, 649 (Fla.2000); Bonifay v. State, 680 So.2d 413, 419-20 (Fla.1996).
In the instant case, the mother and grandmother of the victim testified at the Spencer hearing about the impact of her death upon their lives and about the uniqueness of the victim at such a young age. As admitted by Rose, this testimony was permissible as provided for by the statute and precedents of this Court. See Mansfield, 758 So.2d at 649; Bonifay, 680 So.2d at 419-20. We conclude no reversible error has been demonstrated.
Addressing the second part of this claim, Rose recognizes that section 90.616, Florida Statutes (1997), provides:
(2) A witness may not be excluded if the witness is:
. . . .
(d) In a criminal case, the victim of the crime, the victim's next of kin, the parent or guardian of a minor child victim, or a lawful representative of such person, unless, upon motion, the court *804 determines such person's presence to be prejudicial.
This right is also provided for by the constitution. See art. 1, § 16, Fla. Const. Ms. Berry, the mother of the minor child victim here, was clearly covered under the statute and therefore was properly allowed to remain in the courtroom. See Gore v. State, 599 So.2d 978, 985-86 (Fla.1992). In addition, there has been no showing here of any prejudice by the presence of these persons.

Reading of Nonstatutory Mitigation to Jury
In issue thirteen Rose argues the court erred in refusing to instruct the jury concerning fourteen nonstatutory mitigators which were present in the case. Rose concedes that this issue has been resolved unfavorably to him in opinions of this Court. Essentially this Court has held that trial courts are required to give only the "catch-all" instruction on mitigating evidence and nothing more. See Zakrzewski v. State, 717 So.2d 488, 495 (Fla.1998). Therefore, no error occurred.

Proportionality of Death Sentence
Due to the uniqueness and the finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). In conducting this review, this Court makes a comprehensive analysis in which it determines whether the crime falls within the category of both the most aggravated and the least mitigated of murders, see Cooper v. State, 739 So.2d 82, 85 (Fla.1999), thereby providing for uniformity in the application of the sentence, see Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998).
We do not find the death sentence disproportionate here. The court initially found five aggravators: (1) capital felony committed while on felony probation;[8] (2) prior felony involving violence;[9] (3) committed during a kidnapping;[10] (4) HAC;[11] and (5) victim less than twelve years old.[12] As earlier discussed in issue 7, supra, the fifth aggravator was inapplicable. However, we have concluded that the proper finding of the remaining four aggravators renders the use of the age aggravator harmless.
As to statutory mitigators, the court rejected the following: (1) under the influence of extreme mental or emotional disturbance; (2) impaired capacity to appreciate the criminality of his conduct; and (3) defendant's age at the time of the crime (thirty-one years old). As discussed in issue 11, supra, the trial court's decision to reject the statutory mitigators was supported by competent substantial evidence. See Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). In its consideration of the nonstatutory mitigators, however, the court found the first statutory mitigator to qualify as nonstatutory. The court then addressed the remaining nonstatutory mitigators as follows: (1) defendant's non-nurturing childhood (some weight); (2) defendant is of below average intelligence and is a slow learner (little weight); (3) the defendant is an alcoholic and was intoxicated at the time of the murder (nonexistent); (4) defendant's employment history (some weight); (5) defendant is a good person who has adapted to life in prison (little weight); *805 (6) cooperation with the police (little weight); (7) defendant's unwavering maintenance of his innocence (little weight); (8) defendant's performance of specific good deeds (little weight); (9) defendant possesses specific good characteristics (some weight); and (10) defendant's poor health (nonexistent).
We have affirmed death sentences where there was even less aggravation than in the current case and somewhat comparable mitigation. See Sliney v. State, 699 So.2d 662 (Fla.1997) (finding the death penalty proportional with the existence of two aggravating circumstances of commission during a robbery and to avoid arrest, two statutory mitigators (age and lack of criminal history), and a number of nonstatutory mitigators); Hayes v. State, 581 So.2d 121 (Fla.1991) (affirming the death penalty where evidence established two aggravating circumstances of CCP and commission during a robbery, one statutory mitigator (age), and other nonstatutory mitigators). Rose asserts, however, that we have also found the death sentence disproportionate in other instances. In Nibert, for instance, we reversed a death sentence where "the record shows that Nibert was a child-abused, chronic alcoholic who lacked substantial control over his behavior when he drank, and that he had been drinking heavily on the day of Snavely's murder." 574 So.2d at 1063. However, the current case is different from Nibert in that the evidence of extreme mental or emotional disturbance and Nibert's impaired capacity at the time of the crime were uncontroverted. Considered in that light, we find the present sentence distinguishable and conclude that it meets our proportionality requirements.

Extended Time on Death Row
In issue fifteen Rose maintains that because he had been continuously incarcerated since October 27, 1976, and has been under a sentence of death since May 13, 1977, sentencing delay in his case violates the state and federal constitutions. In essence, he contends that prolonged stay on death row constitutes cruel and unusual punishment. We have addressed a similar claim in Hitchcock v. State, 578 So.2d 685 (Fla.1990), wherein the appellant argued the delay between his arrest and resentencing violated his right to a speedy trial and his due process rights and constituted cruel and unusual punishment. The Court found the claim to be without merit. See id.; see also Hitchcock v. State, 673 So.2d 859, 863 (Fla.1996) (rejecting renewed claim of delay in sentencing). Likewise, we find Rose's argument here is without merit.

Electrocution as a Method of Execution
In issue sixteen Rose contends that imposition of a sentence of death by electrocution violates his state and federal constitutional rights. This issue has been resolved unfavorably to Rose since the Legislature recently amended the death penalty statute to provide that execution shall be by lethal injection unless the sentenced person affirmatively elects to be executed by electrocution. See Arbelaez v. State, 775 So.2d 909 (Fla.2000); Kearse v. State, 770 So.2d 1119 (Fla. 2000).

Jury Note Issue
Finally, Rose asserts that he should get a life sentence because at his guilt phase trial back in 1976, the jurors sent a note to the trial judge informing him: "We are tied six to six, and no one will change their mind at the moment. Please, instruct us." Rose, 425 So.2d at 525. Rose asserts that the jury's note should be treated as a recommendation for life. We have already rejected this claim. See id.
*806 Accordingly, for the reasons explained above, we affirm the judgment and imposition of the death sentence upon Rose.
It is so ordered.
SHAW, HARDING, LEWIS and QUINCE, JJ., concur.
WELLS, C.J., concurs in result only with an opinion.
PARIENTE, J., concurs in result only.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
WELLS, C.J., concurring in result only.
As I did when this case was here in 1996, I again find that the death penalty should be affirmed. However, I do not join in parts of the majority opinion, including the discussion of the Brady, Richardson, and prosecutorial comment issues.
I also write to repeat my serious concern about the length of time of the judicial process in capital cases from the 1970s and 1980s. This was an October 1976 crime, and the case has yet to reach postconviction proceedings. I believe all who are involved in postconviction proceedings in this and other similarly situated capital casesthis Court, the trial judges, the state attorneys, and collateral counsels simply must give these cases the highest priority.
The proceedings in this case on rehearing in this Court should be expedited, and, if rehearing is denied, also in the postconviction proceedings in state court. If no relief is granted in state court, postconviction proceedings in federal courts need early attention. If this defendant's sentence is not to be executed, he should be removed from death row at an early time from now. On the other hand, if the sentence is to be executed, then that should be done at an early time from now. Even if proceedings are expedited, if the sentence is executed, it is likely that this case will have been in the courts for thirty years. Plainly, we must focus upon and deal with issues in this process which have resulted in such an extended period.
ANSTEAD, J., concurring in part and dissenting in part.
I concur in all respects with the majority, with the sole exception of its treatment of appellant's claim of an entitlement to a jury recommendation of life based upon the jury's six-to-six vote as to the penalty in his original trial. I write separately, as I did in Patton v. State, 784 So.2d 380 (Fla.2000), to address what I perceive to be a fundamental injustice perpetuated by the majority's rejection of appellant's claim.
During the penalty phase of appellant's trial, and, after seven hours of deliberation, the jury sent a note to the court stating, "We are tied six to six, and no one will change their mind at the moment. Please instruct us." Rose v. State, 425 So.2d 521, 525 (Fla.1982) (emphasis supplied). Instead of telling the jury that a six-to-six split was a perfectly acceptable vote, the judge erroneously sent the jury back with an admonition to reach a majority vote. In appellant's initial appeal, Rose asserted that the trial court erred in not accepting the jury's vote as a recommendation for life as provided by Florida law, and instead, improperly giving an Allen[13] charge to the jury. This Court agreed that the trial court had erred:
At that point, the trial judge should have advised the jury that it was not necessary to have a majority reach a sentencing recommendation because, if seven jurors do not vote to recommend death, *807 then the recommendation is life imprisonment. There was no reason to give the "Allen charge" during the penalty phase of the trial.
Id. at 525. However, instead of accepting the jury's unequivocal and undisputed six-to-six vote, this Court ruled that the State was entitled to another opportunity to convince a new jury to recommend the death penalty. In doing so I believe we erred and permitted a fundamental injustice that we now have the opportunity to correct.
This Court and the U.S. Supreme Court have held that a capital defendant who once receives a life recommendation from a jury is entitled to that recommendation throughout any subsequent proceedings under the principles of double jeopardy. See, e.g., Torres-Arboleda v. Dugger, 636 So.2d 1321, 1326 (Fla.1994); see also Keen v. State, 775 So.2d 263, 287 (Fla.2000) (citing Monge v. California, 524 U.S. 721, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998)). Of course, the principle that a six-to-six vote by an advisory jury is a life recommendation is well established. See, e.g., Scott v. State, 657 So.2d 1129, 1132 (Fla.1995) ("[A] 6 to 6 split ... constitutes a life recommendation under Florida law."); Amos v. State, 618 So.2d 157, 161 (Fla.1993) ("By a vote of six to six, the jury returned a recommendation of life for the killing of the store clerk...."); Cave v. State, 476 So.2d 180, 187 (Fla.1985) ("[W]e are dealing with an advisory sentence which does not require a unanimous vote for a recommendation of death or a majority vote for a recommendation of life imprisonment.").
In my view, we should recognize our previous error as a manifest injustice, considering the gravity of the issue, the extent of the jury's deliberations, and the clarity of the jury's vote. These are clearly inappropriate circumstances for adhering to stare decisis. See Delgado v. State, 776 So.2d 233, 241 (Fla.2000) ("While we are aware of the importance of stare decisis, this principle must give way to common sense and logic."); State v. Owen, 696 So.2d 715, 720 (Fla.1997) ("This Court has the power to reconsider and correct erroneous rulings in exceptional circumstances and where reliance on the previous decision would result in manifest injustice, notwithstanding that such rulings have become the law of the case.").
Finally, I note my agreement with the views of Justice Marshall of the U.S. Supreme Court, expressed in a similar case:
Petitioner was deprived of a jury's life recommendation without any court having found that advisory verdict unreasonable. Under Florida law, a 6-to-6 vote is a life recommendation. See Rose v. State, supra, at 525. When the trial judge received the jury's note indicating that it was deadlocked 6 to 6, there was therefore nothing left for him to do but recall the jury and apply the Tedder [v. State, 322 So.2d 908 (Fla.1975)] standard to its life recommendation. I can scarcely believe that the trial judge would have overridden such a recommendation in this case; had he done so, he doubtless would have been reversed on appeal. But instead, the trial judge altered the verdict by giving an Allen charge. Then, even while holding the judge to have erred in giving the charge, the Florida Supreme Court proceeded to disregard the fact that the jury's deadlock was a finding for defendant on the issue of death. The Supreme Court's decision to remand was not based upon any finding that a life sentence was unreasonable. The Supreme Court remanded only because the jury's report of a 6-to-6 deadlock had not been contained in a formal recommendation. Since I do not believe that this adherence to formalism is consistent with the double jeopardy concerns implicated by *808 the Supreme Court's demand that petitioner convince yet another jury that he does not deserve to die, I must dissent from this Court's refusal to hear this case.
Patten v. Florida, 474 U.S. 876, 878, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985) (Marshall, J., dissenting) (footnote omitted).
NOTES
[1] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] Though Rose enumerates twenty separate issues, we address all of his claims in the following seventeen issues: (1) the trial court erred in allowing the State to present gruesome photographic evidence; (2) the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in its late release of autopsy photographs; (3) the trial court erred in failing to rule following a hearing held pursuant to Richardson v. State, 246 So.2d 771 (Fla.1971), concerning the late discovery of the Brady material; (4) prosecutorial comments made during closing arguments were harmful to Rose; (5) the State engaged in misconduct in its cross-examination of the defense's expert; (6) the trial court erred in allowing the State to elicit testimony designed to imply that a sexual assault had been committed; (7) the trial court erred in allowing the State to present evidence of the impermissible age aggravator; (8) the trial court erred in (a) its consideration and finding of the "prior violent felony" aggravator and (b) impermissibly doubling this aggravator with the "parole" aggravator; (9) the trial court erred in finding the kidnapping aggravator; (10) the trial court erred in finding HAC; (11) the trial court erred in its consideration of mental mitigation; (12) victim impact testimony was improperly allowed; (13) the trial court erred by refusing to read nonstatutory mitigators; (14) the sentence is not proportional; (15) the time spent on death row violates Rose's constitutional rights; (16) death by electrocution violates state and federal constitutions; and (17) Rose deserves a life sentence on the ground of the penalty phase "Allen charge" issue from his original trial.
[4] It should be noted that the Brady claim here is limited to penalty phase issues because the photographs only go to the manner of death, not to identity or other reasonable doubt-related factors that might have been relevant at the guilt phase. Brady, of course, is applicable to both guilt and punishment. See Strickler, 527 U.S. at 280, 119 S.Ct. 1936.
[5] Contrary to the State's assertion, this Brady claim seems to be properly before this Court. Rose brought this matter up below and a Richardson hearing was held determining whether improprieties were committed. That was sufficient to properly preserve this issue. Nonetheless, as discussed above, the claim is without merit.
[6] Though the first inquiry seemed proper by itself, combined with Detective King's examination, it may be that the State attempted to send some signal about Rose's proclivity to commit sexual assault. In light of the trial court's earlier ruling about staying away from this issue, this line of questioning may have been risky on the part of the State. However, by itself, this was harmless. See James, 695 So.2d at 1234.
[7] Rose also submitted his age at the time of the crime as a statutory mitigator. We conclude that the trial court properly rejected this mitigator. Rose was thirty-one years old at the time.
[8] See § 921.141(5)(a), Fla.Stat. (1997).
[9] See § 921.141(5)(b), Fla.Stat. (1997).
[10] See § 921.141(5)(d), Fla.Stat. (1997).
[11] See § 921.141(5)(h), Fla.Stat. (1997).
[12] See § 921.141(5)(l), Fla.Stat. (1997).
[13] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).